BRADLEY FERTILIZER Co. *v.* THE EDWIN I. MORRISON *et al.*[1]

(*Circuit Court, S. D. New York.* October 24, 1889.)

SHIPPING—DAMAGE TO CARGO—EVIDENCE.

On libel for damages to a cargo, it appeared that while the vessel was passing through a heavy gale, during which she shipped great quantities of water, and which injured her greatly by loosening timbers, etc., which were found floating in her waist, it was discovered that a brass plate which covered a hole in the water-way, used for bilge-pumps, and which was sunk flush with the top of the water-way, was gone. The plate had a movable cap, projecting about three-eighths of an inch above its surface, with edges beveled to one-eighth of an inch. It was in plain view, and appeared to be in good order at the commencement of the voyage, but was not tested except by inspection, which was found to be such as might be expected of a reasonably prudent master or owner. The plate had been screwed on, and the screw-holes were not smooth, black, or rusty. The surrounding wood was sound and white, and the screw-holes were ragged, showing that clear wood had come away. Such a plate is not unusual in vessels, and is considered a permanent fixture, and is not liable to deterioration by lapse of time. The vessel had been in use about 11 years. Ther was no direct evidence as to how the plate was lost. *Held,* that its loss was caused by an accident, resulting from a danger of the sea, which could not reasonably have been anticipated.

In Admiralty. Libel for damages. On appeal from district court. 27 Fed. Rep. 136.

### FINDINGS OF FACT.

(1) The schooner Edwin I. Morrison, owned by the claimants, was chartered December 19, 1883, by written charter-party, to the libelant for a voyage from Weymouth, Mass., to Savannah, Ga., to carry a complete cargo of guano in bags and (or) bulk for a price agreed upon.

[1] Reversing 27 Fed. Rep. 136.

(2) By the charter-party, it was agreed on the part of the vessel that she "should be tight, staunch, strong, and every way fitted for such a voyage," and "the dangers of the sea (were) mutually excepted."

(3) Under this charter, there was loaded on board said schooner, by the libelant, a cargo of guano, superphosphate, and other fertilizers, viz., 343 1680-2240 tons in bulk, and 410 35-61 tons in bags, besides 3,925 empty bags and sacks. Six bills of lading were given therefor, which acknowledged the receipt of said cargo in good order and condition, and agreed to deliver the same in like good order and condition at Savannah the dangers of the seas only excepted. The bulk cargo was stowed b tween-decks, and the remainder in the lower hold.

(4) The cargo was what is known as a "dead cargo," and a hard one for a vessel to carry in severe weather.

(5) The vessel was not overloaded. She was accustomed to, and able to carry, that amount of cargo of the same character at that season.

(6) The vessel was built in 1873, had three masts, was about 155 feet long over all, carrying spanker, mainsail, foresail, forestay sail, jib, flying jib, outer jib, foretop sail, maintop sail, and mizzen-top sail. She was properly manned and equipped. Her officers and crew consisted of a master, first mate, second mate, steward, and four sailors. On this voyage she had two passengers on board, viz., the master's wife and a lady friend.

(7) On the port side of the vessel, in the water-way, and close to the bulwark, there was a hole about three inches in diameter, made when she was built, for the purpose of introducing a hose-pipe into her bilges to free her of any water accumulated there. The water-way (of yellow pine) was about three and a half inches above the deck. The hole was a short distance in front of the poop, and ran down through the water-way, between the ceiling and the skin of the ship. The hole was covered by a brass plate about four inches square, countersunk into the timber, flush with the top of the water-way, and fastened by four brass screws. In the brass plate was a removable cap, also of brass, intended to be unscrewed from the plate, when the hole was to be used, but it had not in fact been used for four or five years, (if, indeed, at all,) and was painted over whenever the water-way was painted. The removable cap projected about three-eighths of an inch above the surface of the plate, the edges being beveled so as to leave not more than an eighth of an inch of perpendicular surface. There was a similar plate and cap on the starboard side of the vessel, but somewhat further aft, and upon the poop deck.

(8) Such bilge-pump holes are not unusual in vessels constructed in some localities. The plates are generally considered permanent fixtures, not peculiarly susceptible to deterioration from age. Verdigris sometimes forms around brass screws, thus weakening the hold of the wood, but water-ways located as this was, well covered up and well painted, are not liable to rot, and their reasonable expectation of sound life is largely in excess of 12 years. If the plates and caps which are generally used to cover such holes are not kept tight and secure, the holes become danger-

ous; but that mode of covering was generally deemed secure by sea-faring men, and seldom, if ever, have any accidents arisen from their use.

(9) The bilge-pump hole heretofore described as located in the waterway was opposite a port in the bulwarks of the vessel. The opening of the port was about a foot square, beginning about two inches from the bulk-head of the poop deck. The poop deck was about four and a half feet above the main deck, and extended from just abaft the mainmast to the stern.

(10) Said bilge-pump plate was in plain view, upon a casual inspection, at the time of making the charter and loading the vessel. The vessel was loaded several times before this voyage by the libelants.

(11) Before the vessel sailed, the cap and plate appeared to be in good order, with no indication of looseness. The examination which was at that time made of them consisted of such inspection as could be given by the eye; and to such an inspection they were from time to time subjected. They were not tested either by unscrewing the cap or the plate, or by tapping the plate with a hammer. Tapping with a hammer or unscrewing the cap might have developed any insecurity (if there were any) in the bilge-pump plate. Immediately after the loss of the port bilge plate (hereafter described) the mate tested the condition of the similar plate on the poop deck, starboard side, by tapping with a hammer, and found it apparently sound.

(12) The examination which was made of the cap and plate, as set forth in the eleventh finding, (viz., by a survey, without the use of special tests, unless there is some appearance of defect,) is such as a reasonably prudent master or owner might be expected to give them in order to determine the seaworthiness of his vessel before beginning a voyage.

(13) The voyage began on the 5th day of January, 1884, and the vessel actually got to sea on the 7th, when she encountered a strong northwest gale. The light sails were furled, and the mainsail and foresail double reefed. The gale caused her to labor heavily, and ship large quantities of water, some of which entered the cabin, and reached the cargo. The vessel was driven out of her course and into the Gulf Stream. The gale moderated somewhat the latter part of the day, but the vessel still continued to roll heavily, and shipped plenty of water. The pumps were attended to, and the vessel was found to be making considerable water. The next day the gale continued, with a very heavy sea running, until about 4 P. M., when it moderated, and at 6 P. M. top-sails were set. The latter part of the day there was a strong breeze, and two reefs were made in the spanker. The vessel made little water this day. The next day (the 9th) began with a strong south-east breeze, which freshened to a strong gale. Two reefs were made in main and fore sails. At 4 P. M. the spanker and jib were furled. The middle part of the day there was a very sharp gale, and heavy sea running. The vessel labored heavily, and shipped great quantities of water. The pumps were carefully attended to, and she was found to be making considerable water. The latter part of the day the wind was still increasing, and the foresail and fore-stay sail were furled. It was then blowing a "living" gale from the west-

ward.   The weather through the night continued to be extremely severe. There was "a terrific gale of wind."   Planks were carried away from the bulwarks of the starboard side of vessel; also one of the ports.   The water-way on starboard side was started off.   The covers of the chain locker and a spar were found loose in the morning, floating in the waist of the vessel on both sides.   Coal washed about decks; also buckets and bucket racks; also pieces of bulwark.   The forecastle door and galley door were washed off, but were not lost.   The men could not stand at pump on main deck, because it was continually swept by the seas; and it was with difficulty that they were able to work at the pump on the poop deck, which was about four and a half feet higher than the man deck, on account of the sea breaking over.   Before midnight the vessel was hove-to under a storm try-sail, two-reefed foresail, and fore stay sail, on the port tack.   The vessel was shipping water through the cabin windows, doors, and down the booby hatch.   The cabin was situated in the after part of the poop deck.   The top of the cabin-house was about three and a half feet above the deck. They commenced to take water in the cabin while eating supper, and all through the night it forced its way in.   This was unusual, and indicated very bad weather and a rough sea.   Everything in the cabin was drenched, excepting the berths, by water washing around the cabin with motion of vessel.   Water reached the cargo during the night through the cabin, a strained water-way, and otherwise.   The pumps were tried every two hours; and by 4 o'clock Thursday morning it was discovered, by the pumps bringing up guano with the water, that the cargo was wet.   The master of the vessel did not go to bed during the night, but was mostly on deck.   Previous to 4:30 o'clock in the morning they were able to get a suck on the pumps, indicating that there was no water then in the well, but after that were unable to do so.   At this time the weather was very bad; a very bad sea flooding the decks continually, and washing everything movable about.   About 5 o'clock they sounded, and founded 18 inches of water in the well.   In about half an hour afterwards they wore ship, putting the vessel before the wind, so that the men could stand at the pumps.   This gave the vessel a list to port.   The only outlets on the port side for the seas that came aboard were the open port above mentioned and the scuppers.   They continued pumping, but still were unable to get a suck, and at 9 o'clock soundings showed about seven feet of water in the vessel.   Preparations were then made to abandon the vessel, as she was supposed to be sinking.   The lashings of the boat on the poop deck were cut, and the women on board came up from the cabin to take the boat.   Between 10 and 11 o'clock they wore ship, and the vessel slowly righted up, the booms swinging from the port to the starboard side, bringing the port side out of the water.   The vessel was then working heavily in the sea, losing steerage-way, and settling fast.   When the vessel righted up and rolled her lee side out of water, the second mate, who, with others, fastened with lines to prevent them from being washed away, was working at the pump on the main deck, heard a heavy gurgling sound, and let go the pump and went over to the port side, put his hand against the rail, and looked down under it to where the bilge-pump

plate was, and saw a hole large enough to put his hand in. He ran his hand and arm down the hole, and sung out to the captain, "Look here!" Being greatly excited, and not looking for such a thing, he hardly realized what the trouble was. The captain came, and said, "My God, this is the bilge-pump!" It was found that the whole bilge-pump plate, with the screws, was gone.

(14) The wood to which the plate had been fastened looked white and sound. From the holes out of which the screws had come, part of the clear wood was itself hauled, the splinters hanging around the edges of the holes; the holes thus presenting a ragged look. The screw-holes were not smooth, nor black, nor rusty. The wood of this particular waterway, in the vicinity of the plate, did not look rotten; and when, after arrival at Savannah, the temporary plugging referred to in the seventeenth finding was removed, and the hole plugged and covered with sheet-lead, the timber into which the plug was driven, and on which the lead was nailed, was found solid; and since that time the covering has not been further repaired, nor the timber changed in any way.

(15) No marks of violence other than the splintering of the wood about the screw-holes was visible upon the water-way, or upon the adjacent bulwarks or stanchions.

(16) As no one witnessed the removal of the bilge-pump plate, direct evidence of the cause of this mishap is not obtainable. It is, however, to be inferred, from the facts proved, that it was knocked out by something striking violently against it, subsequently to the time when they wore ship after finding eighteen inches of water in the well, which would be between 5 A. M. and 5:30 A. M.

(17) The hole was at once plugged up, covered with canvas, and sheet-lead nailed over the canvas.

(18) At this time the wind had abated somewhat. The vessel's wheel was tied hard up, and the sails trimmed so that she would lie to, and the crew went to work pumping again, and gained on the water. By 11 or 12 o'clock that night they succeeded in getting her free of water so far as the pumps could do so, and the journey was continued.

(19) Afterwards it was found that the mainmast had been loosened by the working of the vessel, and that the coating was broken; also that a scupper on the starboard side was broken.

(20) The weather continued severe during almost the entire voyage, and the injury to cargo was increased thereby.

(21) The vessel arrived in Savannah, January 27th.

(22) Upon the arrival, she delivered her cargo, some of it in a damaged condition. The extent of the damage was $9,175.40.

(23) At the time of the contract, and lading of cargo, and commencement of voyage, the vessel was tight, stanch, and strong, and in every way fitted for the contemplated voyage.

(24) There was no latent defect in the vessel which contributed to the injury of the cargo.

(25) There was no fault or negligence in the navigation of the vessel or care of the cargo.

(26) The whole of said damage to cargo was caused by a danger of the seas, and was within the exception in charter-party and bills of lading.

### CONCLUSIONS OF LAW.

*First.* The damage is to be attributed to the dangers of the seas, and not to the fault of the vessel.

*Second.* The decree of the district court is reversed, and the libel dismissed, with costs of both courts.

*George A. Black,* for libelant.

*Wilcox, Adams & Macklin,* for the Edwin I. Morrison.

LACOMBE, J., (*after stating findings and conclusions as above.*) The grounds of decision in this case are perhaps sufficiently indicated in the findings. That the vessel was not unseaworthy by reason of overloading (a fault not charged in the libel) seems to have been the conclusion finally reached by the district court upon the rehearing. Such a conclusion is accordant with the testimony. Her behavior with seven feet of water in her well, and a cargo of wet guano in her hold, and the manner in which, after the leak was plugged, she recovered her buoyancy, should be conclusive on this point. So, too, on the rehearing, the district court found, as her witnesses testify, that before the plate was knocked off the vessel had encountered dangers of the sea, by reason of which there was eighteen inches of water in her well, and her cargo was damaged to a considerable extent. It is indeed hard to conceive by what casualty the plate could have been removed, while the water-way in which it was fastened was still on the weather side, and the evidence shows that they did not wear ship, thus developing the list to port, until after the eighteen inches of water had been found in her well.

It only remains to determine what caused the loss of the plate. There is no direct evidence on this point; only inferences to be drawn from known facts. That it was knocked out of sound wood by a blow from some floating article, which left no marks of violence upon the bulwarks or stanchions because it was swept overboard through the open port, is certainly not impossible. That the wood was rotten, or the fastenings defective, seems disproved by the condition in which the holes were found. The vessel was not originally unseaworthy because she had bilge-pump holes covered as these were. The presumption of continuing seaworthiness in respect to this part of the ship is not rebutted by the single fact-that no special test was made as to their condition, in view of the testimony (especially that taken in this court) as to what is the usual examination given to such structures. They are considered as permanent fixtures; are located in the upper works, where they are almost constantly in view; and are not liable to deterioration from the lapse of time. Moreover, the evidence as to the condition of the water-way, and as to the torn and ragged appearance of the holes, indicates that they were reasonably fit to resist the ordinary shocks and action of the sea, and were displaced by an accident of an extraordinary nature,

and the application of a degree of force which a reasonably skillful and prudent owner would not have anticipated or guarded against. There is no question of latent defect, the inference to be drawn from the testimony being that there was no defect, patent or latent; that the fastenings were sufficient, and were knocked out by a blow such as could not reasonably have been anticipated, and which was caused by a danger of the sea.

### ON APPLICATION TO AMEND FINDINGS.

(December 18, 1889.)

LACOMBE, J. Upon the two principal amendments to the findings asked for by the libelant, namely: (1) To insert the word "apparently" in the twenty-third finding; and (2) to prefix to the twenty-fourth finding the words, "It is to be inferred from the facts found in the 16th finding,"—his motion must be denied. The libelant claims that there was in fact some defect or weakness in the plate and cap, and the screws which secured them; that in consequence they washed out, and allowed the water to enter the vessel. Whether such defect or weakness existed or not is a question of fact, which it is the duty of the circuit court to decide. Such decision must be presented, as a finding of fact, to the appellate court. The conclusion reached upon all the testimony was that there was no such defect. No doubt that conclusion was reached as an inference from the facts in proof. No one distinctly testified: "I made an elaborate examination of the cap, plate, and screws before the vessel sailed. They were then in sound condition, and I saw them knocked out by floating stuff washing across the vessel's deck, and out through the open port." Nevertheless, the testimony, taken as a whole, indicates that this was in fact what happened. If this court should amend the twenty-third and twenty-fourth findings in the manner suggested, the supreme court might reverse on the express ground that, because there was no distinct finding of fact to that effect, it must be inferred that the claimant did not convince the circuit court, as a matter of fact, that the vessel was tight, and that there was no latent defect in the plate, cap, or fastenings. But that is the very conclusion to which an examination and comparison of all the testimony adduced by both sides has led this court; and therefore compliance with the act of 1875 seems to require the statement of such conclusion as a finding of fact.