THE DUNBRITTON.[1]

DARRAGH et al. v. THE DUNBRITTON. CROOKS et al. v. SAME. KNUDSON et al. v. SAME.

(Circuit Court of Appeals. Second Circuit. March 3, 1896.)

1. SHIPPING—DAMAGE TO CARGO.
    In a suit to recover the amount of damage found by appraisers to have been done to certain bags of nux vomica and turmeric, by reason of stains upon the packages from oil cargo, it was shown at the trial that the goods were sold by the consignees for the full market price of sound goods, and that the purchasers never made any objection to them or claimed any allowance for damage. *Held* that, as they sustained no loss, the ship was not liable.

2. SAME—PERILS OF THE SEAS—CARRYING AWAY OF VENTILATORS—ADMISSION OF WATER.
    Damage by sea water entering the ventilator holes, after the ventilators had been carried away by a heavy sea which came aboard in a gale off the Cape of Good Hope, smashing one of the lifeboats, and breaking frames

---

[1] Rehearing denied March 17, 1896.

and stanchions, *held* to be the result of a peril of the seas, for which the ship was not liable, where it appeared that the firmness of the ventilators had been thoroughly tested by shaking, and by examination of the flanges and the screws and bolts securing them to the deck, although the screws and bolts were not taken out for inspection. 61 Fed. 764, affirmed. The Edwin I. Morrison, 14 Sup. Ct. 823, 153 U. S. 199, distinguished.

3. SAME—CHARACTER OF PROOF.
Where the ship has shown a sea peril which left water aboard that might reasonably be expected to cause the damage found to exist, it will be presumed to have produced it, if there is satisfactory proof that any or all other suggested causes did not produce it. 61 Fed. 764, affirmed.

4. SAME—DAMAGE BY OIL.
Damage done by Ceylon cocoanut oil, which, though properly stowed, escaped by natural and usual leakage into the hold, and was afterwards carried up into contact with the cargo by water that entered the ship in consequence of a sea peril, *held* to be the result of a sea peril for which the ship was not liable. 61 Fed. 764, affirmed.

5. SAME—PROPER STOWAGE—CEYLON OIL.
Although Ceylon cocoanut oil, partly by reason of its inherent qualities and partly because of bad cooperage, always leaks greatly from the casks, yet *held*, on the preponderance of evidence, that it is not improper stowage to place it in the between-decks, over dry cargo in the hold, provided the decks are permanently laid, in thorough order, well caulked and tight, and provided with sufficient scuppers for the escape of leaking oil. 61 Fed. 764, affirmed.

6. SAME.
Where oil is stowed in the between-decks, near an open hatch, beneath which dry cargo is placed, and is found to be damaged at the end of the voyage. the burden is on the vessel to show, not merely that the damage could have been caused by a sea peril, but that it could not have been caused otherwise.

7. SAME—"BROKEN STOWAGE."
When packages susceptible to damage from oil are taken as "broken stowage," the ship is not entitled to use them as dunnage for casks of oil which are known to be so liable to leak as those which come from Ceylon, or to stow them in immediate physical contact with such casks, where it is almost inevitable that they will be soaked with oil before the end of the voyage.

8. SAME—PRESUMPTIONS—"OIL DHOLLS."
There being a cheap variety of coir yarn coming from Colombo, Cochin, and Alleppy, in the shape of dholls, which are known as "oil dholls," because not susceptible to damage by oil, *held* that, when dholls of coir are receipted for by the ship as "oil broken stowage," it may be assumed, in the absence of evidence to the contrary, that they are of that cheap kind, and may, according to the custom of the trade, be stowed with oil-casks.

These are appeals from decrees of the district court, Southern district of New York, dismissing libels in rem, filed to recover from the ship Dunbritton for damages to cargo sustained on a voyage from Colombo, Cochin, and Alleppy to New York. The three cases were tried together, and the evidence is voluminous. The word "libelants" is used hereafter in this opinion, sometimes as referring to the libelants in some one of the suits, sometimes collectively to the libelants in all three suits, as the context may indicate. The decrees of the district court were entered April 25, 1894. See 61 Fed. 764.

Geo. A. Black, for appellants.
Wm. D. Gutherie, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge.    The Dunbritton was built in 1874 or 1875.    She is an iron vessel, with two decks, both wood, and three hatches in each deck.    She is 237 feet long, 38 feet beam, 22 feet deep; 1,471 tons net, and 2,100 tons gross.    On her deck she had two ventilators, one abaft the foremast, the other 6 feet aft of the mainmast.    These ventilators were 5 feet high.    Each was made up of three parts,—the flange, the funnel, and the cowl.    The flange was a cast-iron ring inserted vertically downward into the deck the thickness of the plank, with a 3-inch horizontal rim projecting around it level with the surface of the deck, and screwed fast thereto with 6 screws and 6 bolts, inserted through holes either drilled or cast in the rim.    This flange extended vertically above the deck some 6 or 8 inches, and was about 15 inches interior diameter.    The funnel of the ventilator was made of galvanized sheet iron, and was screwed on the flange.    It was provided on top with a cowl or hood, with a bell-mouth.    The forward ventilator opened into the between-decks, but there was no opening below it from the between-decks into the lower hold.    The main ventilator opened into the between-decks, and directly below it was an opening in the between-decks, 18 inches square, by which access was had to the water tanks in the lower hold.    Around this opening was a shaft of open slat work 4 feet square, extending up to the main deck.    This shaft was used as a means of access to the water tanks and pump well.    To descend the shaft, it was, of course, necessary to remove the funnel of the ventilator.

On January 6, 1892, the Dunbritton was chartered by Darragh, Smail & Co., of Alleppy (the East Indian house of the libelants in the first suit), by a charter party which required her to proceed to Colombo and the Malabar coast, there to load "from charterers or their agents a full and complete cargo, consisting of lawful merchandise, including cocoanut oil," and thence to proceed to New York.    She began loading at Colombo on March 3, 1892, took some cargo aboard at Cochin, and, having completed loading at Alleppy, sailed for New York on May 11th.    Speaking generally, her cargo was stowed as follows:    In the lower hold, fore and aft, plumbago, with dholls of coir; in the rest of the hold, cocoanut oil, with dholls, and upon the oil bales of fiber, ballots, and mats, and some bags of nux vomica; in the between-decks, a few barrels of plumbago aft against the bulkhead of the lazarette; in front of them, and extending forward to the after hatch, some 40 or 50 casks of cocoanut oil, with bags of turmeric on top of them; and from thence forward rolls of matting, bales of fiber, coir yarn, mats, some tea, et cetera.    The vessel arrived in New York October 19th.    Discharge of cargo commenced October 24th, and was completed November 28th.    Upon discharge, portions of the cargo below were found in the condition hereinafter set forth:    (a) There were taken out of the lower hold about 186 casks of oil (i. e. cocoanut oil, which will hereinafter be referred to as "oil" simply), consigned to Darragh & Smail.    These were shipped at Cochin, and stowed in the lower hold, four or five tiers deep.    Cochin oil, as a rule, is better coopered than Colombo oil, and is a superior article.    It suffers much less from leakage.

This Cochin oil was found in good condition, and no claim has been made for any damage to it. (b) To the libelants Crooks & Co. was consigned the oil taken aboard at Colombo. The evidence shows that the oil was properly dunnaged. None of it had shifted, but there was an exceedingly heavy loss by leakage. Crooks & Co. made claim for this upon the Thames & Mersey Insurance Company, which had underwritten their oil, and collected $3,671.06. Whether the company paid this claim because it thought the loss had resulted from sea perils, or because the policy covered leakage in excess of some named average, does not appear and is immaterial. No claim for damage to this oil was made against the ship. (c) The nux vomica and the turmeric consigned to Darragh & Smail appeared to be somewhat damaged by oil, and these libelants claimed to recover therefor such sums as the appraisers estimated the damage to amount to. Near the close of the trial, however, claimant's counsel elicited from one of the libelants' firm the fact that both the turmeric and the nux vomica were sold for the full market price of sound goods, despite the oil stains on the packages; that the purchasers never made any objection to them, nor claimed any allowance for damage; and that his firm really lost nothing on either. Further discussion as to the turmeric and the nux vomica is unnecessary. Since Darragh & Smail sustained no loss, there is no loss to be made good to them, either by ship or underwriter. (d) The plumbago, which consisted of 924 barrels of Knudson's and 435 of Crooks' (1,359 altogether), was stowed, without any separation by marks, fore and aft in the lower hold, except the 15 or 20 barrels in the between-decks next to the lazarette. Of these there were found to be 718 barrels damaged by oil, of which 386 belonged to Knudson, and 332 to Crooks, and these libelants seek to recover therefor. (e) A part of the bales of yarn, cocoa mats, and matting consigned to Darragh & Smail was found to be damaged by sea water. The amount of loss thereby was claimed from the Delaware Insurance Company, and has been adjusted. No claim therefor is made against the ship. (f) It appeared that other parts of Darragh & Smail's consignment, consisting of mats, matting, bales of coir yarn, bales and ballots (a ballot is a little bale) of coir fiber, were damaged by oil. Claim for loss is made in the libel. (g) Darragh & Smail had on board of the ship 16,721 dholls of coir. A "dholl" is a round skein of yarn, wound together and tied up, about 30 inches long and 5 in diameter, thick at one end and narrow at the other. Of these, about 9,000 were found to be damaged by oil, and claim for loss thereon is made in the libel.

Two theories are advanced to account for the damage to the plumbago. For the ship it is contended that during a severe storm a heavy sea carried away the ventilators; that the apertures thus left in the deck remained open for a considerable time, while seas were constantly breaking over the deck; that, in consequence, great quantities of water got into the ship, first into the between-decks, and thence into the lower hold, in part by the ventilator shaft, in part by the hatches, and principally by the scuppers: that there had been much leakage from the Colombo oil, due to inherent vice in the oil and packages, and, as the pumps sucked at $3\frac{1}{2}$ inches, there was

considerable oil already in the bottom of the ship when the irruption of water came through the ventilators, and that much additional oil leaked out into the hold before the ship was cleared of this water; that after discerning that the ventilators were carried away, and covering up the apertures, it was found that there were 3 feet of water in the well; that in two days this was reduced to $5\frac{1}{2}$ inches, but so much water was distributed through the cargo, whence it drained gradually into the bottom of the hold, that it was two weeks and more before the ship was freed from it; that the large quantity of water shipped during the storm rose above the level of the ceiling, bearing the oil on its surface; and that, during the rolling and tossing consequent upon the conditions of wind and sea, the oil was thus washed up onto the cargo stowed in the bottom and wings of the ship. It is the theory of libelants that the oil leaked through the deck of the between-decks, aft of the after hatch, where 40 or 50 barrels of the oil were stowed, onto the plumbago in the after lower hold.

The ship having delivered the plumbago in bad order, it is for her to show that the damage was the result of a sea peril. It is necessary, therefore, to examine more carefully the evidence upon which she relies to establish this proposition. The first part of the voyage was prosperous, but in the latter part of June the ship ran into heavy weather and storms. Iron ships rarely leak, and during this period the pumps, although regularly attended to, seem to have disclosed the presence neither of water nor of oil in the hold. As before stated, the pumps sucked at $3\frac{1}{2}$ inches; and in view of the superabundant and uncontradicted testimony that Ceylon oil packages are peculiarly susceptible to leakage, and of the further fact that during the bad weather prior to July 10th the ship was a good deal knocked about, it is reasonable to assume that there was considerable oil in the bottom, although not enough to be reached by the pumps. July 10th opened with the wind gradually increasing and a heavy southwest swell. In the afternoon it was blowing a fresh gale, with a very high confused sea running. About 7 p. m. (it was dark at the time, which was winter off the Cape of Good Hope), a very heavy sea came aboard. It carried away the starboard lifeboat, and also the port one, smashing the latter in the port rigging. The donkey-room and galley-room doors were torn off. The pigsty and the steam winch cover, a large teak-wood box, were carried away. The sea, as the mate testified, also "broke three frames, one inside the fo'castle, and two outside, and two stanchions also, the bulwark stanchions. Also, the rail and the bulwark was cut about six feet just by the sea, and also the bulwark plate it stove in; also, the topgallant rail and the pin rail." The chief surveyor for Lloyds Register, who examined the ship upon arrival at New York, testified that there was damage "mainly on the starboard side of the forecastle, the after end of the forecastle, where the plates were bent inward, and three frames broken. The after end of the forecastle or wing was completely carried away, excepting just a piece on the deck. There were damages also to the main rail, and there were iron stanchions broken. There was a lifeboat smashed or badly broken,

and second boat injured." He added that "this breaking of frames on an iron ship is very unusual, and excessive damage for an iron ship to suffer. Have never seen more than two or three similar cases since I have been a surveyor, and that is a good many years now." The same sea tore away the funnel and cowl of the forward ventilator from the flange, and carried away the main ventilator, flange, bolts, and all. In consequence, two apertures, 15 inches in diameter, were left open in the deck, over which repeated seas, though none so heavy as the first, were breaking; and, by reason of the darkness, no one perceived that the ventilators had been carried away, for a period of time variously estimated at from three-quarters of an hour to an hour and a half. When the loss of the ventilators was discovered, the holes were covered temporarily with canvas and battens. Subsequently, the forward ventilator was replaced on its flange, and the flange of the main ventilator again bolted in place. The mate who saw the carpenter sound the pumps next morning testified that they found 3 feet of water in her. No entry to this effect appears in the log; the mate who kept it explaining that, for some days after the damage was done, he was so busy repairing the ship that he wrote nothing in the log at all. By July 12th the water was reduced to $5\frac{1}{2}$ inches, but it was nearly two weeks before it was all out, presumably by reason of gradual drainage out of saturated cargo. When they pumped after July 10th, oil for the first time came from the pumps, and thereafter in considerable quantities. That large quantities of water poured down through the ventilator holes is proved by other witnesses from the ship, and that this is just what would happen under the circumstances is surely self-evident.

Necessarily, the narrative of these events of July 10th comes from the mouths of the officers and crew, and from them alone; and it is proper that, in weighing all such evidence, a court should have due regard to the bias which may be supposed to operate on the minds of men whose carefulness and fidelity to duty are issues in the case. But it does not follow that they are to be held perjured whenever some of their statements of fact run counter to the claim of a libelant. A careful study and comparison of the ship's evidence as to the storm and its results has satisfied us that, in all substantial particulars, the narrative above given is accurate. There is nothing marvelous about it. Ships have in the past suffered like ill usage from wind and sea, and other ships will undoubtedly have similar experiences in the future. Moreover, the evidences of damage which were found to exist when the Dunbritton finally reached port confirm the story of those who sailed in her.

The regular periodical survey of the Dunbritton was held in August, 1891, and she was classed A1 at Lloyds. At about the same time, Capt. Auld, the "overlooker" for claimants, also made a special examination, preliminary to her purchase by claimants. He testifies that he examined carefully around the ventilators, for fear of any rot being about them. The screws or bolts were not removed. He found the ventilators in first-class order, with regard to soundness and repair. The ship's carpenter testified that the ventilators prior to July 10th were in perfect order; that he had to overhaul

them every Saturday, and see that everything was right, and that nothing was leaking; that he found them in sound and good repair every time he examined them; that at Alleppy, before the cargo was finished, in the course of his examination, he took them off the collars or flanges, and went below when the decks were washed down, to see that the screws and bolts were tight. Then he put the elevator on, screwed it to the collar, and shook it to test its firmness. He did not unscrew the flange from the deck. A seaman testified that, when he went down to the fresh-water tanks, he had to lift the main ventilator off, and put it on, and was also engaged scraping, cleaning, and painting it; that he saw it two or three times a week, and it was all right up to July 10th. Similar testimony was given by another of the crew. One of the partners in the firm of shipwrights who furnished a new flange for the main ventilator when the ship was repaired in New York testified that he saw the old flange before removal, and afterwards the place on deck from which it had been removed. No one asked him as to the condition of the wood, but the new flange seems to have been put in the old place.

We are clearly of the opinion that the carrying away of the ventilator, and the consequent taking in of water, was a sea peril, for the results of which the ship is not responsible. The case of The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, is relied upon as controlling to a different conclusion. It is, however, clearly distinguishable from the case at bar. The mishap to the Morrison was the loss of a plate and cap covering the orifice of a bilge pump. The plate, which was of brass, was let into the port waterway, and fastened in place with screws. The removable cap projected about three-eighths of an inch above the surface of the plate. During a heavy storm, when there was much water on the deck, both cap and plate were found to be missing; the screws having been torn out of the wood, part of the wood going with them, leaving white splinters hanging around the holes, which thus presented a ragged appearance. The holes were not smooth nor black nor rusty. From the small amount of projecting surface upon which a blow could be delivered, and from the condition of the screw holes, the circuit court (40 Fed. 501) reached the conclusion that the plate had been torn out by a blow of extraordinary violence, and inferred that some floating article, probably one of several planks which the evidence showed had been carried away from the bulwarks on the starboard side, had been hurled violently end-on against the cap, and, tearing out cap, plate, and screws, had gone overboard with them, through an open port in the bulwarks, about a foot square, immediately opposite the plate, leaving no other marks of violence in the vicinity. This, of course, was only an inference. No one testified to seeing a plank or anything else strike the cap. The supreme court, however, was not satisfied with the soundness of this inference, as is evident from the following excerpt:

"There was no direct evidence that the plate was knocked out, or, if this were so, that it was by some extraordinary collision; and while the fourteenth finding [as to the splintered appearance of the holes] tends to support the inference of the sixteenth [that the plate was knocked out by something striking violently against it] it will be observed that the tendency of the fifteenth [that no other marks of violence were found in the vicinity] is to rebut it. If it appeared

that the wood was solid, and the screw holes splintered, the drawing out of the screws might be imputed to a blow or blows; but, on the other hand, if there were no marks of violence in the vicinity, since such blow or blows, to effect the result, if the cap, plate, and waterway were in good condition, must necessarily have been of great violence, it seems almost incredible that no marks thereof appeared on the stanchions and bulwarks on the port side, and that nothing but the cap and plate were carried away." 153 U. S. 214, 14 Sup. Ct. 823.

It seems to be the conclusion of the court that the cap and plate "were so made or so fastened as to be * * * knocked off by some ordinary blow from objects washed by the sea across the decks." In the case of the Dunbritton, however, there is direct evidence of a blow delivered by the sea upon those parts of the deck where the ventilators projected five feet above the surface, and that the same blow was of such violence as to tear off deck-house doors, smash lifeboats, cut away the rail, stove in bulwark plates, and break three iron frames and two iron stanchions,—"very unusual and excessive damage for an iron ship to suffer." Certainly, there is convincing proof here of an extraordinary blow, to the effects of which the ventilators were exposed, and which left abundant other marks of its violence in the vicinity.

The supreme court, in the Morrison Case, further says:

"If, however, the vessel had been so inspected as to establish her seaworthiness when she entered upon her voyage, then, upon the presumption that seaworthiness continued, the conclusion reached by the circuit court might follow."

The proof showed that the bilge-pump hole had not been used for four or five years, if at all, and that the cap and plate were painted over whenever the waterway was painted. The only inspection of them which was proved consisted of such an examination of them as could be given by the eye, without testing either by unscrewing the cap or the plate, or by tapping the plate with a hammer. Such inspection was held sufficient by the circuit court, which, from the strong indications afforded by the splintered condition of the holes, and certain direct proof that upon arrival at the port of destination the timber of the waterway where the plate had been inserted was found to be solid, reached the conclusion that there was no defect, patent or latent, and therefore nothing unseaworthy which a more rigid inspection would have disclosed. The supreme court, however, held the inspection to have been insufficient, manifestly because it did not concur with the circuit court as to the cause of the disappearance of the cap and plate, as appears from the following excerpt:

"The obligation rested on the owners to make such inspection as would ascertain that the caps and plates were secure. * * * In relying upon external appearances in place of known tests, respondents took the risk of their inability to satisfactorily prove the safety of the cap and plate if loss occurred through their displacement. We are unwilling, by approving resort to mere conjecture as to the cause of the disappearance of this cap and plate, to relax the important and salutary rule in respect to seaworthiness."

In the case at bar, however, there is not only general testimony as to the apparent condition of the ventilators, almost from day to day, but proof of a special inspection and testing of their security according to known tests. The carpenter's evidence on this point is

direct, positive, and sufficient. The proposition that, although shaking or tapping gives no indication of insecurity, nevertheless everything which is fitted into a ship with screws or bolts must be unscrewed or unbolted before each voyage, so that the condition of the interior of all screw and bolt holes may be thus inspected, has not, in our opinion, been declared to be the law in the Morrison Case, nor in any other to which our attention has been directed.

Having proved a sea peril for the results of which she is not responsible, the ship must next show that it is that sea peril which caused the damage to the cargo. This may be done by negative as conclusively as by positive proof. The sea peril having left water aboard the ship, which might reasonably be expected to cause the damage found to exist, it will be presumed to have produced it, if there is satisfactory and sufficient proof that any or all other suggested causes did not produce it. In the case at bar the proof is both positive and negative. As before stated, the theory of the ship is that the water taken aboard, bearing the oil upon its surface, rose in the hold to such a height that the rolling, pitching, and tossing of the ship caused oil and water to be dashed upon the lower tiers of barrels and those stowed in the wings. It is manifest that the condition of the barrels when discharged would have a most important bearing on the question whether the damage was thus produced, especially since the only other suggested cause—a leakage through the after between-decks—would expose the plumbago barrels to the action of oil alone, unaccompanied by water. On this branch of the case, very many witnesses have been examined, and the testimony is extremely conflicting. The witnesses called by the ship (and among these are many who certainly must be considered as indifferent to the result of the case) testified that the plumbago barrels damaged by oil were also more or less stained with sea water. On the other hand, the witnesses called by libelants, some of whom were interested either for shippers or for insurance companies, and others of whom were apparently disinterested, testify that the damage was caused by oil, and that there was no evidence of salt-water damage. It is not, however, difficult to reach a conclusion upon the whole body of proof bearing upon this part of the case, if certain important circumstances are borne in mind. The examination into the condition of the plumbago was had at the conclusion of a long voyage. One witness, indeed, testified that it might be expected that the contents of barrels damaged by salt water in July would still be moist when opened in September; but the weight of the testimony is overwhelmingly to the contrary. Whatever salt water had attacked the plumbago had long since dried up, and its presence was to be detected, if at all, by the stains and rust it left behind it. Most of the witnesses on both sides agree that such traces will remain on the outside of a plumbago barrel which has been damaged by salt water, though one or more of libelants' witnesses are of a different opinion. Many of the libelants' witnesses, and notably those most disinterested, went to examine plumbago which they had been informed was oil-damaged, with the object of deciding if it was so damaged, and to what extent. When they found undoubted evidence of oil damage,

they had done all they undertook to do. If any of the packages were also water-damaged, it would not be surprising if they gave no particular attention to that fact. Some of them declined to swear positively that there was no sea damage. Moreover, to sustain the theory of the ship, it is not necessary to show that the packages of plumbago were "damaged" by salt water in the sense in which that word is used by insurance appraisers and trade experts. If cocoanut oil is as penetrating as the testimony tends to show, it may well be supposed that, when the composite liquid was splashed upward on the lower tiers of barrels, it was the oil that forced its way into the package or clung to its exterior, the water receding with but little injurious result. In consequence, it is easy to see how a package might in that way be damaged either inside or outside wholly by oil; while the traces of the presence of any salt water could be detected only upon a careful examination, directed particularly to determine such presence. It does not appear that any of libelants' witnesses were informed, at the time they examined the plumbago, in what way the ship accounted for the presence of the oil on the barrels. Presumably, they supposed it was a case of improper stowage. The testimony of Swallow, the weigher, called by libelants, is most suggestive. He was an independent witness, employed by libelants to weigh their oil and plumbago. He personally weighed 969 barrels, and marked on his book, according to his practice, the number of barrels which were oil stained. He thus noted the greater part of the 718 damaged barrels. It is equally his custom to examine for stains from salt water, and to note them when found. Out of the 969 barrels thus examined, he only marked one with a "w," indicating it was water-stained. But he further testified that if barrels had had salt water on them two or three months previous to his examination, and had completely dried, he would not mark them in this way on his book, unless they were badly discolored. For that reason he refused to swear that there was only one of the 969 barrels which showed evidence of water stains, stating that there was only one thus noted in his book, because there was not enough water damage on the other barrels to injure the lead inside.

Taking all things into consideration, it must be held to be established by a fair preponderance of proof that the condition of the plumbago barrels when discharged in New York was such as tended to show that the damage was caused by oil brought into contact with the barrels through the action of the sea water shipped during the storm. There is no suggestion of any other way in which this oil damage could have been caused, except by leakage through the between-decks. It will be remembered that some 40 or 50 casks of oil were stowed in the between-decks aft of the after hatch, with plumbago in the after hold immediately below. The libelants contend that this was improper stowage under any conditions; that not only was Ceylon oil always liable to leak out of the casks to a considerable extent, but that, as one or two of their witnesses testified, it was so penetrating that it would flow through a permanently laid three-inch deck, planks and seams alike, apparently like Cathode rays through a pine box. The other witnesses for the libelants, however, do not

sustain this proposition. Undoubtedly, Ceylon oil, partly by reason of its inherent qualities, partly because of bad cooperage, always leaks greatly from the casks; but the clear preponderance of proof is to the effect that it is not improper stowage to place it in the between-decks over dry cargo in the hold below, provided the between-decks are permanently laid, in thorough order, well caulked and tight, and provided with sufficient scuppers for the escape of such oil as may leak out of the casks, which, by reason of the continuing heat of the interior of the ship, will remain liquid even after she has reached an outside temperature sufficient to congeal it. The Dunbritton's between-decks was provided with waterways along the sides of the ship, and scuppers, four on each side, about 25 feet apart, one pair about abreast of the after part of the after hatch. The scuppers were $2\frac{1}{2}$ to 3 inches in diameter, and ran into the bilges or limbers. The inspector of the insurance company, called by libelants, testified that oil will clog the scuppers; but since there is direct and positive testimony that the Dunbritton's scuppers were free and clear when she sailed, and free and clear when she arrived, and there is not a scintilla of evidence to indicate any clogging on the voyage, his testimony hardly rises to the dignity of proof. The testimony of the captain that the oil pumped up was "in regular balls, as large as your head," on which libelants lay some stress, manifestly indicates the condition of the oil when it was ejected from the discharge orifice of the pump into the colder air of the main deck.

The condition of the between-decks as to tightness is therefore the only question of importance in this branch of the case. The between-decks was caulked in San Francisco in 1891, by the ship's carpenter, under the supervision of the then captain, who testified that the work was thoroughly well done, the between-decks watertight and in perfectly safe condition for carrying liquid cargo. After the periodical inspection, and the special one of Capt. Auld, in August, 1891, which he says was thorough, and showed the between-decks to be well caulked and tight, the Dunbritton sailed from Cardiff to Mahé, in the Seychelles Islands, with a cargo of coal, and thence in ballast to Colombo. On the voyage from Mahé to Colombo, the vessel was carefully prepared for taking in the new cargo. The inside of the ship was thoroughly washed and painted, and particular care was taken to see that the between-decks was tight. A thorough examination was made of this deck, and the carpenter went carefully over it at the time the deck was wet down in washing the ship, and caulked every place which showed any signs of leaking or wearing away of the pitch and oakum in the seams. In the between-decks there are several ballast hatches, four of them aft of the after hatch. They are apertures cut in the deck planking, two of them 2x3 feet, and the two others 4x8 feet. The portions of plank thus cut out of each hatch are edge-bolted together, and provided with a ring for lifting. They fit back as a hatch cover into the place from which they were removed, resting on the deck beams. These hatches have no coamings. It is not usual to have them around ballast hatches. They were off when the plumbago was being stowed, were replaced before the oil was stowed, and,

under the captain's express instructions, the ship's carpenter caulked them tight. After she was entirely discharged in New York, and the between-decks cleaned up, Capt. Auld testifies that the seams of the between-decks all looked very good, and showed no evidence of leakage; and the stevedore who loaded her for her next voyage confirms this statement.

In the nature of things, all this testimony as to inspection and caulking comes from the ship, but it is inherently probable. It is to be supposed that ship's officers who are about to load liquid cargo over dry make some effort to ascertain if the deck between is tight or not, and that subordinates who are ordered to caulk seams obey orders. The assumption may not be strong enough to take the place of proof; but, when officers and crew testify directly and positively to the facts, their evidence is not to be rejected as of no weight merely because the witnesses come from the ship. Before their uncontradicted evidence will be thus disregarded, there must be satisfactory proof of some other fact or facts inconsistent with their story. Such proof, the libelants contend, is furnished by their witnesses, who describe the condition of affairs in the between-decks and below it when the Dunbritton arrived in New York. The question, however, does not lie simply between those on the ship testifying that the decks were tight, and uncontradicted independent witnesses testifying that they had leaked. The claimants produced many witnesses, quite as independent of personal bias or interest as were the libelants', who testified positively that no oil had leaked through the between-decks. Of the libelants' witnesses on this branch of the case, Keegan, a clerk for libelants Darragh & Smail, testified quite freely to oil running through holes in the deck and dripping from the ballast hatches; but he locates the place between the main and after hatches (where, indeed, no oil was stowed), says that the cargo beneath was bags and bales of coir, and admits that he did not go aft of the after hatch, but stood on bales in the after hatch, and sounded from that position the casks of oil, not then removed from their place of stowage. As proof of any leak in the seams of the after between-decks, his testimony is of no value. Knapp, a clerk for libelants Knudson, Paterson & Co., testified that he saw not only the dirty between-decks where the packages of oil had been leaking, but also plumbago, 200 barrels of it, lying underneath the between-decks, all covered by cocoanut oil. The weight to be given to this statement becomes apparent when the witness goes on to say that he was only twice below the main deck, the first time before any of the after lower hold had been discharged, the second time after it had all been discharged; that on the first occasion he did not go below the between-decks at all, but looked at the plumbago stowed below from the after hatch. It is difficult to see, if the cargo in the lower hold had not been touched at that time, and came, as he says, within two feet of the under part of the between-decks, how he could see the condition of affairs under the between-decks except in the immediate vicinity of the hatch itself. He says there was plenty of light to see there, and speaks of two ballast hatches being off, but subsequently confines his positive statement

to the ballast hatches between main and after hatch, and only says he thinks there were others which let light down. That oil poured down through the after hatch upon the cargo below is abundantly proved, and the ship's liability therefor will be discussed later on. That condition of affairs undoubtedly impressed this witness (and, indeed, all the others called by libelants); but his evidence to there being any leak through the seams of the after between-decks has no weight. He was not in a situation to form an intelligent judgment upon that question. Wilbur, a salesman for libelants Darragh & Smail, went into the between-decks October 26th, and subsequently, on October 29th, in company with Getshow and Evald, into the between-decks and the lower hold. He only testified, however, to seeing three ballast hatches, "through which oil could run," and could not tell from any examination he made whether any oil had in fact leaked through. Dumont, a surveyor of marine damages for underwriters, testified to seeing oil on the between-decks, and to his "opinion" that it went down on the plumbago; but his recollection of his visit to the ship is extremely vague, and he admits that he has no recollection of going into the lower hold at all. Getshow, an experienced stevedore, not employed by the ship, who was aboard to investigate the condition of affairs, stowage, etc., at the request of Darragh & Smail, testified only to one leak, namely, through the seams where one of the ballast hatches fitted into the deck. He did not go into the hold, formed his opinion from looking at the surface of the between-decks, but was very positive that the seam was open, so that oil could go through; so wide open was it that, according to the record, the witness undertook to indicate the width of the seam with his hands; and the seam was full of oil, with which at the time the entire aft between-decks was covered. He admitted, however, that he could not tell whether the ballast hatch had been lifted and replaced; and from the evidence given by the ship's witnesses, the time when this examination was made, the amount of oil still on the between-decks, and the condition in which these ballast hatches were found by Getshow and by Evald, who thrust his pencil through the seams, we are satisfied that they had been already lifted, and temporarily replaced. If this be so, there is no evidence from Getshow sustaining the contention of libelants that there were leaks in the between-decks. In view of the discrepancies in the testimony of Beirne, the cooper called by libelants, and the contradiction of some of its most material parts by testimony to which we give greater credit, and the manner in which it was given, we find it unsatisfactory proof of the presence of oil beneath the between-decks, except in the square of the after hatch and its immediate vicinity. He did not at any time while below look up at the underside of the between-decks. Evald, an inspector for underwriters, went aboard the ship three times, and on the last occasion, the oil casks in the between-decks being then removed, and the ballast hatches visible, made a report to his employers that there was a large amount of loose oil in the between-decks where the oil packages had been stowed, and on the underneath side a heavy coat of oil, "showing that the oil had soaked through every seam of deck, but most of it

appears to have run through the four ballast hatches abaft the after hatch." His testimony on the trial indicates that the examination from which he reached the conclusion expressed in this report was made principally in the between-decks. He says that he "went down into the between-decks," and "then saw oil on the deck where it had soaked through the seams,"—"from the lazarette up to the after hatch." The location of the lazarette was defined by a bulkhead in the between-decks, but not in the lower hold. Subsequently he went down into the after hatch, where they had broken down the cargo. The ballast hatches were all in place at the time, and most of the plumbago in place; but the witness says he "could see the space abaft just as well,"—a statement we are not inclined to credit. His opportunities for a careful examination of the underside of the between-decks seem to have been limited. He was evidently much impressed by the fact that he could thrust his pencil through the seams around the ballast hatches (not knowing that they had been lifted), and, seeing much oil on the between-decks and about the after hatch, made an exaggerated report to his employers, which has operated to make his description of the condition of affairs given on the stand more highly colored than his original inspection would fairly warrant. Moreover, on the trial he no longer talks of oil which had "soaked through every seam," but confines the leakage almost entirely to the ballast hatches. And those hatches could hardly be lifted and replaced on a deck flushed with oil without some of it being smeared over, and making its appearance on the underside of the seams.

When all this evidence is compared with that produced on the other side, notably the testimony of Nelson, the stevedore, who himself removed the upper tiers of the plumbago stowed in the after hold (a job which required him to work so close to the between-decks that his head came frequently into contact with its underside),—testimony supported by that of others whose opportunities for examination were better and more frequent than those of libelants' witnesses,—and when the positive evidence from the ship as to inspection and caulking of the between-decks is thrown into the scales, we are satisfied that the clear preponderance of proof is against the proposition that the oil which damaged the plumbago leaked through the between-decks, and, that being so, have reached the conclusion that the damage was the result of the irruption of sea water through the broken ventilators, a sea peril for which the ship is not responsible.

Some portion of the plumbago, however, sustained oil damage under circumstances which lead to a different conclusion. The between-deck hatches were not on during the voyage, being left off for purposes of ventilation. From the bottom of the ship, plumbago was stowed in the square of the after hatch up to the coamings in the between-decks; and on top of the plumbago in the after hatch were bales of fiber extending upward to the after hatch of the spar deck. The between-deck packages of oil were stowed from near the lazarette up to the coaming of the after hatch amidships. On the port side they extended to within about two feet abaft the coaming,

and on the starboard side to about the forward end of the hatch. It is abundantly proved that oil and also water poured over the coamings of this after hatch, and damaged a number of barrels of plumbago, variously estimated at from 20 to 30 in number. Whether this oil was altogether such as was carried on the surface of the water which came aboard at the time of the storm, and no doubt washed around the between-decks while it was seeking an exit through the scuppers, the open hatches, and the shaft to the water tanks, or whether part of this oil poured over the coamings without the assistance of any water, no one can tell. In view of the great quantity of oil that leaked from the casks (a leakage which the condition of the between-decks shows to have continued almost, if not quite, down to the day of arrival in New York), it is by no means improbable that some of this oil washed over the coamings of the after hatch on other occasions than during the storm of July 10th. The deck was built with a crown adapted to induce whatever oil leaked out to flow to the scuppers; but the Dunbritton was a sailing ship, and there were undoubtedly during the voyage long periods of time when she was heeled over so that the windward waterway and the crown of the deck were in the same plane. Moreover, the wood dunnage would cut this plane surface up into a great number of little reservoirs, with outlets more or less obstructed. A comparatively shallow accumulation of liquid oil between the coamings and the nearest casks might readily be swept over the coamings, which were only 3½ inches high, by some sudden roll or pitch of the ship. Having undertaken to carry oil over dry cargo, the ship can justify such stowage only by showing that the deck between was tight. Certainly, so far as the after hatch was concerned, it was not tight. Cargo stowed below in the square of that hatch has been damaged; and unless the ship can show that this damage was caused by a sea peril, and not by improper stowage, she must be held responsible. In this case she only shows that it could have been caused by a sea peril, and does not negative the possibility of its being caused otherwise. For the damages to these 20 or 30 barrels of plumbago, the libelants Crooks & Co. and Knudson, Paterson & Co. are entitled to a decree, as interest therein may be made to appear.

The libelants Darragh & Smail claim for oil damage to mats and matting, coir yarn, and coir fiber. Of their consignment, 1,000 rolls of matting, 1,923 bales of coir yarn, and 314 bundles of mats were stowed in the between-decks forward of the after hatch. Manifestly, since there was no oil stowed in the between-decks except aft of the after hatch, this damage could be caused only in one or other of two ways. Either portions of this dry cargo were stowed next to the oil barrels, or on top of them, with insufficient dunnage to protect them from contact with any oil which might leak or spurt out, or else oil reached the dry cargo by flowing over the deck. It is unnecessary to discuss the evidence as to dunnage. The turmeric and nux which were stowed on top of the oil packages are out of the case; and, as to all the rest of the between-deck cargo, there is a clear preponderance of proof that the dunnage was proper and sufficient to protect it, not only against contact with the oil packages,

but against whatever oil might be expected to flow upon the deck. The dunnage wood raised the dry cargo 2½ to 3 inches above the deck, and there would, in our opinion, have been no damage to it had not the great volume of water shipped during the storm floated the oil on its surface, and thus raised it above the dunnage where it could injure the dry cargo. As to all the rest of Darragh & Smail's dry cargo (except the dholls) stowed in the lower hold, none of it was placed below oil; and we are satisfied from the proof that such as was stowed on oil was properly dunnaged; that no oil leaked upon any of it from the between-decks, except on one bale, through a seam near the mainmast, and possibly on a few bales of fiber stowed in the square of the after hatch; and that the oil damage was caused in the way already described in discussing the plumbago claims. In our opinion, therefore, the ship is not liable, except for the bale near the mainmast, and those, if any, in the after hatch.

As to the dholls of coir a different question arises. The charter party provides that the ship shall "load for the charterers a full and complete cargo of lawful merchandise, including cocoanut oil in casks ('broken stowage,' at charterers' option, to the extent of 10 per cent., to consist of coir dholls, of from four to six English pounds weight each)," etc. Darragh & Smail shipped 16,721 dholls, which were stowed promiscuously with other cargo in all parts of the ship. Some 9,000 dholls were found to be damaged by oil, and a part of these by sea water as well. Undoubtedly, the damage to many of these was caused in the same way as was the damage to the plumbago, and, for damage thus caused, the ship is not responsible. But the proof indicates quite clearly that all of the dholls which were found to be oil-damaged were not thus affected only because of the presence of the water taken in through the ventilator holes; some of the dholls were exposed directly to leakage. This technical phrase "broken stowage" is not defined in any authorities to which we are referred, but the evidence of the experts, although not in all particulars in full accord, is sufficiently explicit to enable us to construe that phrase for the purposes of this case. All agree that packages taken as broken stowage may be stowed anywhere where there is a vacancy for them. Small packages thus taken are put into places where there are vacant spaces left in stowing casks and bales and bags, and may be put between clean cases of anything. There is some conflict in the expert testimony as to the amount of risk which the shipper takes of damage to cargo thus shipped. It is reasonable to assume that, as he pays but half rates, he takes some risk; but to what extent the ship should protect broken stowage from contact with other cargo is not entirely clear upon the proof. Inasmuch, however, as there is no claim made against the Dunbritton for any other damage to the dholls than that from oil, it is not necessary to determine any general measure of obligation. We are of the opinion that, when packages susceptible to damage from oil are taken simply as broken stowage, the ship is not entitled to use them as dunnage for casks of oil, which are known to be so liable to leak as are those which come from Ceylon, nor to stow them in immediate physical contact with such casks where it is almost in-

evitable that they would be soaked with oil before the voyage was ended. The libelants' witnesses, however, testify that there is a kind of broken stowage, especially from Colombo or Cochin or Alleppy, which is stowed all over the ship, even among the oil casks. It is known as "oil dholls," a cheap variety of coir, that oil does not injure. There were three lots of dholls taken aboard the Dunbritton,—one from Alleppy, described in the bill of lading as "8,080 dholls coir yarn"; another from Colombo, described in the bill of lading as "3,991 dholls coir yarn, shipped as broken stowage"; and the third from Cochin, described in the bill of lading as "4,650 dholls coir yarn, shipped as oil broken stowage." Undoubtedly, bills of lading are not independent contracts, but merely receipts for cargo shipped in accordance with the original agreement contained in the charter,—a proposition to which both parties assent, citing Steamship Co. v. Theband, 35 Fed. 620, and Crenshawe v. Pearce, 37 Fed. 432. But when it appears that this particular lot of dholls was receipted for by the ship as "oil broken stowage," with no objection on the part of the charterer who shipped them, it may be assumed, in the absence of any proof to the contrary, that those particular dholls were of the cheap quality of coir which oil does not injure, and which, according to the custom of the trade, may, if shipped as broken stowage, be stowed with the oil. It would appear, then, that for some of the damaged dholls the ship is responsible; for others, not. Claimants contend that it is to be assumed that the broken stowage dholls, 3,991 in number, were stowed with the plumbago, and therefore injured only by the oil which was brought into contact with them as a consequence of the sea peril; and that the oil broken stowage dholls only, 4,650 in number, were stowed with the oil, and damaged directly by leakage from the casks. The aggregate of these two lots is, 8,641, which tallies closely with the estimated (9,000) of the number of dholls found to be damaged by oil. Having delivered this large number of dholls in bad condition, however, it is for the ship to show that they, or some part of them, were damaged by sea peril or by some other cause for which the ship is not responsible. There should be some affirmative proof that the different lots were stowed as is suggested. The court cannot assume that they were so stowed, in the absence of any proof at all upon that point. And, in the absence of such proof, the utmost that can be said for the ship is that she has shown that some portion of the 9,000 (what proportion we do not undertake to say) has been injured solely by causes for which she is not responsible. For the part not thus injured she should respond.

The expert evidence introduced by libelants in support of their contention that the Dunbritton was improperly loaded, and for that reason unstable, has not been overlooked. It is sufficient to say that on that point the preponderance of evidence is with the ship.

The decree of the district court is reversed, and the cause remitted to that court, with instructions to decree for the libelants for the damage to those packages for which the above opinion indicates that the ship is responsible, with costs of this court only.