CRENSHAWE *v.* PEARCE.

*(District Court, S. D. New York. January 12, 1889.)*

SHIPPING—LIABILITY OF OWNER FOR CONTRACT—BILLS OF LADING—MISTAKE—
AGENT'S OPTION.

U., the common agent of several different steamships, owned by different owners, and running independently upon stated days, forming the "Guion Line," agreed with libelants to transport about 800 bales of cotton per steamer A. $\frac{and}{or}$ W., agent's option. A part were sent by the A., the rest by the W., a week later. U. only had authority to determine by which vessel "and or" goods should go. Without his knowledge or assent, shipping receipts were delivered to libelants, through some mistake of the subemployes, apparently induced in part by the libelants' slips. The receipts stated that the goods were to go by the A. only; upon the faith of which, without U.'s knowledge, bills of lading were issued, at his office, for all the cotton per steamer A. The cotton shipped by the W. arrived about 10 days later than that by the A., and, the price falling in the mean time, the libelants sued the respondent, who is sole owner of the A., for the loss. *Held* (1) the original contract was the agent's contract only, and did not bind either the vessel or her owners; (2) the different vessels and owners were not liable for each other's contracts; (3) the shipping receipts and bills of lading per A. only, being issued by mistake, and without U.'s knowledge or authority, did not constitute any exercise of the option reserved in the original contract, and did not bind the respondent, as respects the goods carried by the W.; (4) that the W.'s goods had never been delivered to the A., or under her control; and that the respondents were not liable.

In Admiralty.

Action upon three bills of lading for failure to transport 559 bales of cotton by steamer Arizona.

*Evarts, Choate & Beaman,* for libelants.

*Wilcox, Adams & Macklin,* for respondent.

BROWN, J. The libelants, in September, 1887, received from Underhill & Co., in this city, three bills of lading, reciting the shipment of 848 bales of cotton on board the steam-ship Arizona, for Liverpool, dated August 31st, September 1st, and September 2d. She sailed on Tuesday, September 6th. Only 289 bales went by the Arizona. The remaining 559 bales were carried by the Wisconsin, of the same line, which left a week later, and arrived in Liverpool about 10 days after the Arizona. During this interval there was a fall of three-eighths of a penny per pound in the market price of cotton, to recover which this libel was filed.

The evidence shows that on the 24th and 26th of August preceding, written contracts were made between the libelants and the representatives of Underhill & Co., whereby transportation was engaged for "about 800 bales of cotton on board a steam-ship of the Guion line, expected sailing the 6th $\frac{and}{or}$ 13th September, agent's option, subject to the terms and conditions of the form of the bill of lading approved by the New York Produce Exchange;" and that the bales in question were sent by the

libelants to the Guion line under these contracts. The "Guion Line" is a mere trade-name. The vessels that form the "line," and run on stated days, belong to different owners. They are run independently; the accounts are distinct; the owners of one vessel are not interested in, or liable for, the business of the vessels of the other owners. The respondent was sole owner of the Arizona, and had no interests in the other vessels of the "line." The Arizona was advertised to sail on September 6th; the Wisconsin, September 13th. A permit or order was issued, as customary, by Underhill & Co. for the receipt of the cotton by the line. The permit was delivered to the libelants about the 25th of August, and specified the steam-ship "Arizona *and or* Wisconsin, about 800 bales cotton; uncompressed, to Empire Stores; to be delivered on or after August 30th." Under this permit the cotton was all delivered by the libelants either to the Empire press, or at the Guion pier. Two hundred and nineteen bales were delivered to the press, and from there were sent to the Arizona, and carried by that vessel. The rest of the cotton was sent to the Guion pier.

When the permit provides for an option in transportation, by one or more steamers, as in this case, the shipping receipt given at the dock or press, for each lot delivered under such a permit, is required to be in the same form and to specify the names of both steamers; and the bills of lading, which in the usual course of business are obtained at Underhill & Co.'s office in exchange for the shipping receipts, are also issued, as of course, in the same form. In the present case seven different lots were delivered at the dock or press, under the permit; but all the shipping receipts that the libelants received therefor mentioned the ship Arizona only. The evidence shows that this was done without the knowledge or authority of Mr. Underhill, the only person authorized to determine by which vessel the goods should go. It was the result of mere mistake, or misinformation, or misunderstanding, in the absence of instructions from Underhill & Co.; and it was apparently, in part at least, brought about by the libelants themselves. A great number of the libelants' "slips," sent to the line by the car-men or lighter-men along with the goods, were produced in evidence, and all except one state that the goods were to go by the Arizona. The libelants had no right to send with the goods slips thus worded. They should have read "Arizona $^{and}_{or}$ Wisconsin." Although the subagents at the dock or at the press had also no right to act upon the libelants' slips alone, such slips were calculated to mislead, and they no doubt conduced to the mistake in the shipping receipts, if they did not alone cause it.

The option reserved to Underhill & Co. to send goods by the one steamer or the other, was an option beneficial to both parties; to the ship, because it enabled her to take higher priced freights for perishable goods that might be brought forward for transportation on the last day; or, if these were wanting, to fill up with the lower priced cotton. It was beneficial to the libelant, because the ship could afford to take the cotton at a lower freight, in view of the option reserved as to the time of forwarding.

The bills of lading are not, as the libelants contend, the only contracts between the parties. Even if they had been regularly issued, they would only have been in execution of the previous contracts of affreightment, which provided that bills of lading should be given. The bills of lading stand in the same relation to the original contracts of affreightment that bills of lading hold to the charter-parties under which they have been given. In the latter class of cases it has been long settled, not only that the bills of lading do not supersede the provisions of the charter-party in so far as they differ from it, but that they are controlled by the charter-party, in the absence of any proof of authority and intention to make a new contract. 1 Pars. Adm. 286; *The Chadwicke,* 29 Fed. Rep. 524, and cases there cited; *Ardan* v. *Theband,* 35 Fed. Rep. 620. By those contracts Mr. Underhill had the right to send the cotton by either the Arizona or the Wisconsin, or in part by both, as was done. There was no intent by either party to make any new contract. There was doubtless an option to be exercised before the goods could be forwarded. But Mr. Underhill was the only person having authority to exercise this option. The bills of lading are *prima facie* evidence that he did exercise that option in favor of sending all the cotton by the Arizona; but they are only *prima facie* evidence. The answer sets up that they were issued by mistake, and without Mr. Underhill's knowledge or authority; and the proof establishes that fact, both as to the shipping receipts and as to the bills of lading, which followed the shipping receipts, as a matter of course. Papers thus issued, by mistake constituted no exercise of the option reserved to Mr. Underhill; nor any new contract, for want of the necessary assent. When the shipping receipts were presented by the libelant at Underhill & Co.'s office to be exchanged for the bills of lading per Arizona, Mr. Underhill, or the clerks, might lawfully have refused to issue the bills of lading for the Arizona only; and the evidence leaves no room to doubt that they would have done so had either of them known that the shipping receipts had been improperly issued per Arizona only. *Fowler* v. *Liverpool,* 87 N. Y. 190. The shipper is entitled to no advantage from such a mistake.

The libelants' claim rests entirely on their possession of the bills of lading, stating the transportation to be by the Arizona alone, as though the delivery of the bills of lading to them were a final and absolute determination of the option previously reserved, and formed, from the moment of delivery, the only contract between the parties. Even had the bills of lading been deliberately issued by Mr. Underhill himself, it may be doubted whether they would necessarily have had any such effect. Until the libelants had acted upon the faith of such bills of lading, and changed their rights or obligations, I see no reason why a previous determination to send by the Arizona might not have been revoked under the option in the original contracts. Notice of any such revocation would perhaps have been necessary for protection against any subsequent claim by the shipper for damages incurred upon the faith of the bills of lading; but, so far as I perceive, for no other purpose. In this case the libelants in no way changed their situation upon the faith

of the bills of lading. The goods all arrived safely, and in exact fulfillment of the original contracts; and the lack of notice to the libelants that part went by the Wisconsin became immaterial. That question, however, is not presented in this case, because there is no doubt, upon the evidence, that the shipping receipts and bills of lading were not properly issued, and were not any exercise of the option reserved.

Again, upon the evidence, Underhill & Co. had no authority to bind the respondent upon contracts of affreightment for transportation by any other vessel than the Arizona. The original contracts, therefore, were the obligations of Underhill & Co. only, and did not bind the respondent. Under such a contract, the respondent could not become bound until the goods were delivered to the Arizona or her officers, or some other act was done amounting to a final appropriation of the goods to the Arizona, or which imported a contract to transport the goods per Arizona alone. Only Mr. Underhill had authority to make any such appropriation, or any such contract; and, as respects the 559 bales in question, he never made any such appropriation or contract. He did not exercise any such option, nor authorize the bills of lading or the shipping receipts in the form in which they were issued.

Still further, bills of lading, as executory contracts, have not the effect which the libelants ascribe to them. They import a receipt on board of certain goods, to be transported and delivered at the place of destination. The executory contract to transport extends only to the goods actually received on board, or within control of the officers of the ship or her representatives; and parol evidence is admissible to show that only part or none at all of those receipted for in the bill of lading were received, and the contract to convey is thereupon limited accordingly. In *Pollard* v. *Vinton*, 105 U. S. 8,—an action *in personam*,—Mr. Justice MILLER says: "The receipt of the goods lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to carry or to deliver." Accordingly, it is the constant practice for the ship or her owners to limit their apparent responsibility under the bill of lading by proof that less goods were received. 1 Pars. Adm. 190; Carv. Carr. by Sea, § 69; *Goodrich* v. *Norris*, Abb. Adm. 196; *The Saragossa*, 2 Ben. 544; *Sears* v. *Wingate*, 3 Allen, 103, and cases cited; *Querini Stamphalia*, 19 Fed. Rep. 123; *Robinson* v. *Railroad Co.*, 9 Fed. Rep. 140, 16 Fed. Rep. 57. There is manifestly no difference, as respects liability, between an action for not delivering the goods specified in the bill of lading, and an action for damages for not carrying the same goods. The contract in the bill of lading is the basis of both actions alike; and that contract is limited to the goods actually delivered to the ship, or to her representative, under it. Had Underhill been the agent of the Arizona only, a delivery of goods to him at the dock, under a previous contract, on the respondent's account to transport them by that ship alone, would probably be deemed a delivery to the ship, and binding on her owner. But as he was the common agent of all the ships of the line, and had neither made any contract for the Arizona alone, nor appropriated the 559 bales to the Arizona, those bales were never delivered to the Ari-

zona, either actually or constructively; and as to those bales, the bills of lading, which Underhill had never authorized, had no force or validity as receipts or as contracts, as against the ship or her owner.

The present case very closely resembles that of *The Lady Franklin*, 8 Wall. 325, where a common agent of several independent vessels forming a "line," as in this case, agreed to send the libelants' goods by "one of the vessels of the line," and did so; but a clerk, by mistake, and in ignorance of the facts, delivered a bill of lading as upon a shipment by another vessel of the line,—the Lady Franklin,—which was accordingly sued. That case was stronger for the libelant than the present, as most of the goods shipped on one of the other vessels were lost. Mr. Justice DAVIS, in delivering the opinion of the court, says:

"It would be strange indeed, if the owners of the Franklin were made to suffer because the common agent of all the boats had, through inadvertence, given a receipt for merchandise not on the boat, or in the warehouse even, but which was then on board other boats, on its way to its destination."

The case of *Pollard* v. *Vinton*, *supra*, shows that the same rule is applicable to actions *in personam*. On principle and authority the libel must be dismissed, with costs.