KANSAS CITY, PITTSBURG & GULF RAILROAD COMPANY *v.* BARNETT.

Opinion delivered March 16, 1901.

1. CARRIER—LIABILITY FOR ESCAPE OF LIVE STOCK—DELIVERY.—In an action against a carrier for the escape of cattle from its stock pen, in which they had been placed for shipment, where it was a question whether defendant had accepted the cattle for shipment or not, it was error to charge the jury that defendant's liability as carrier began when the cattle were put into its pen for shipment. (Page 156.)

2. DELAY IN SHIPMENT—DAMAGES.—An instruction that where cattle were delivered to a carrier for transportation, and they were not delivered to their destination within a reasonable time. the damage recoverable, if they have fallen in market value, is the difference between their value when they should have been delivered and their value when they were in fact delivered, is erroneous where, by a previous instruction, the court had misdirected the jury as to the time when the liability of the carrier began. (Page 158.)

3. CARRIER—ESCAPE OF LIVE STOCK—DAMAGES.—In an action against a carrier for permitting the escape of cattle from its stock pen, an instruction that if the jury found for plaintiff they should allow the necessary expense incurred in gathering said stock and in

holding them preparatory to reshipment, with compensation for money expended in their collection, is erroneous in so far as it might have led the jury to allow anything on account of plaintiff's expenses incurred in going to a distant city to negotiate with defendant's agent about recovery of the stock or for expenses in holding the cattle longer than was reasonably necessary, after recovery, before shipment. (Page 159.)

Appeal from Little River Circuit Court.

WILL P. FEAZEL, Judge.

*Read & McDonough,* for appellant.

The mere delivery of cattle into the stock pens of a railroad company does not fix upon it the liability of a common carrier. 1 S. W. 446; S. C. 27 Am. & Eng. R. Cas. 49; 42 Ark. 200; 60 Ark. 338; 26 S. W. 312. To hold the company for loss or ·injury of goods tendered for carriage, in addition to a delivery to the shipper, there must be shown an actual or implied *acceptance* for immediate shipment. Hutch. Carr. § 82; 5 Am. & Eng. Enc. Law (2d Ed.), 181. As to distinction between mere *receiving* and *acceptance,* see: Hutch. Carr. § 82; Tied. Sales, § 114. As to difference between railroad company's liability as a common carrier and as a warehouseman, see: 59 Ark. 317; 46 Ark. 222; 60 Ark. 375; 42 Ark. 200. Appellee's recovery is barred by his own failure to comply with his contract by loading the cattle. 56 Ark. 429; 50 Ark. 397; 46 Ark. 243. The court erred in its instruction as to the measure of damages. Appellee should have done all in his power to lessen the damages. Hutch. Carr. § 773. It was error to refuse the first instruction asked by appellant. Hutch. Carr. § 94; 56 Ark. 288; 42 Ark. 200; Hutch. Carr. § 82.

*Oscar D. Scott* and *F. H. Taylor,* for appellee.

BATTLE, J. R. L. Barnett brought this action against the Kansas City, Pittsburg & Gulf Railroad Company to recover damages on account of the loss and escape of, and injuries to, cattle delivered to and received by the defendant for transporation over its line of railroad. Plaintiff states his cause of action as follows: "On the 29th day of March, 1898, the plaintiff was the owner of 104 head of cattle, which he had gathered at Wilton, in Little River county, in the state of Arkansas, on the defendant's line of railway, for the purpose of shipping them to Bonham, Texas, to be delivered and placed on the market at said last-mentioned place by the

30th day of March, 1898. That said Wilton was then and is now a station kept up and maintained by the defendant on its said line of railroad, where it receives cattle and freight generally for shipment, and that on said first-mentioned date the plaintiff applied to defendant at said station for cars and transportation over its said road for the purpose of shipping his cattle over the defendant's road to Texarkana, Texas, and from there to Bonham, Texas, over another road; and said defendant company, through its authorized agent, contracted and agreed with plaintiff to receive and ship his cattle as desired by him, and directed the plaintiff to deliver said cattle in its stock pen at said station, which stock pen it had erected, and did then maintain, for the purpose of receiving cattle and other stock for shipment. That plaintiff then and there delivered all of said cattle in said pen to the defendant, and that defendant did then and there receive said cattle for the purpose of transporting the same for him to Texarkana, and on to Bonham, Texas. That said defendant company had carelessly and negligently permitted said pens to become out of repair, and that the fence around the same was weak and partly rotten, and said company had negligently and carelessly failed to keep the same in repair and strong, and in good condition suitable for holding stock while in said pen, of all of which said company had full knowledge. That after said defendant company had received from the plaintiff all of his said cattle, and while it had them in said pen and in its possession for shipment, it carelessly and negligently permitted all of said cattle to escape from said pen, and from its possession, by reason of the unfitness of said pen to hold cattle, and by reason of its negligence in leaving the gates of said pen unfastened; and, by reason of said carelessness and negligence on the part of the defendant, said cattle scattered out over the country, off and away from said station and beyond the reach and control of the plaintiff; and that the defendant negligently, carelessly and wilfully failed and refused to regather said cattle, or any part of them. That, by reason of the escape of said cattle, plaintiff was compelled to pay out the sum of two hundred and thirty dollars ($230) to have them regathered and fed during the time they were being regathered and delivered at Wilton station for the purpose of shipping the same. That plaintiff was and has been unable to find and regather five (5) head of said cattle that escaped from said stock pen, and the escape of the said five (5) head of cattle was a total loss to the plaintiff; and that they were

worth upon the market at said station of Wilton the sum of $67, three head being grown cows and being worth fifteen dollars ($15) per head, and two (2) head, being yearlings, worth eleven dollars ($11); that he recovered ninety-nine (99) head of said cattle that escaped from said stock pen, and that while they were out they became gaunt and fell off in flesh, by reason of not having any feed, and being scattered out in a country where there was not sufficient range at that time to keep them up; and said cattle were bruised and otherwise injured by reason of said escape; and that when recovered they were in such bad condition generally as to considerably decrease their value upon the market from what it was before the escape, which amounted to $2.50 per head less in value than what they were just before said escape, aggregating a damage to said cattle of $247.50. That, by reason of the escape of said cattle as aforesaid, the plaintiff was delayed sixteen days in delivering said cattle at Bonham, Texas, and that during that time the market price on cattle decreased, and by reason thereof plaintiff received $4 per head for said cattle less than he would have received for them had they not been permitted to escape from defendant's pen at Wilton, Arkansas, and had they been shipped at the time and on the terms agreed upon by the defendant and delivered at Bonham, Texas, in as good condition as they were when they were delivered to the defendant for shipment; which item of damage to plaintiff, by reason of the decrease in value of said cattle upon the market, aggregating the sum of two hundred and thirty-two dollars ($232). That when said cattle escaped the plaintiff, R. L. Barnett, devoted sixteen days of his time in looking after the recovery of said cattle, and lost said time from his other business, which said time was reasonably worth the sum of eighty dollars ($80), and that he paid out his railroad fare and necessary expense in looking after the recovery of said cattle after their escape the sum of twenty dollars ($20), by reason of which he was damaged in the aggregate sum of one hundred dollars ($100)."

The defendant answered, and denied the allegations in the complaint. The issues thus found were tried by a jury, and a verdict was rendered in favor of the plaintiff for the sum of $845 and six per cent. interest thereon from the first day of April, 1898; and judgment was rendered upon this verdict for $844.40; and the defendant appealed.

R. L. Barnett, the plaintiff, testified, substantially, as follows: On the 29th of March, 1898, at Little River county, in this state, he purchased from Gus Palmer 104 head of cattle, consisting of cows, yearlings, and one bull. The stock were delivered on the day of the purchase, between 2 and 4 o'clock in the evening, at Wilton, a station on defendant's railroad, in this state, in the pens of the defendant, which were made in the manner pens for loading and unloading cattle on and off trains are ordinarily constructed. As soon as the cattle were delivered in the pen, he saw the agent of the railroad about their shipment, and told him that he had put 104 head of cattle in the pens to be shipped to Bonham, Texas, and asked him about what time the railroad company would pull the cattle out, and the agent replied that he did not know. There was no agreement between the plaintiff and the agent about loading the cattle. The agent said he would do so. (It is usual and the rule for railroad companies to put cattle on their trains.) About sundown the plaintiff put twelve of the cattle on the cars provided by the defendant for that purpose. He delayed putting the remainder in the cars "because putting them into the cars jammed them around and would damage them." He applied to the agent the second time to know when the cattle would be hauled away, and he said he thought it would be about 10 o'clock that night, and later in the night said it would be sometime. Finally the agent advised the plaintiff to go to bed and promised, if he would do so, to wake him up when the train came and the cattle were put on the cars. About 12 o'clock in the night the agent came and woke him up, and told him that his cattle were out and gone. The next morning plaintiff found all the cattle, except those in the cars and the bull, were gone. They had made their escape by breaking the fence of the pen near the gate. After this he went to Texarkana, and saw Mr. Snooks, an agent of the railroad company, and the company refused to collect the cattle for him. He then employed Goolsby, Goldsmith and Gardner, who knew the cattle, to do so, and they found and collected 99 head. While they were doing so, he carried on negotiations with Mr. Snooks, which continued three or four days. He then returned to Wilton. He spent $20 in railroad fare and other traveling expenses on account of the temporary loss of the cattle. All the cattle, except two, were finally recovered, and returned to Wilton on the 14th of April, 1898, and were on that day shipped to Bonham, Texas; plaintiff having paid the expense of putting them on

the cars, because there were no pens at Wilton to hold them.   When the cattle were recovered, they were in bad condition on account of the loss of flesh.   They were worth at Bonham, Texas, on the 29th of March, 1898, $14 and $18.50.   The freight on two cars of cattle from Wilton to Bonham was $63.40.   Plaintiff held the cattle until July, 1898, when he sold them for $9 and $10.   They were worth that in Bonham on the 14th of April, 1898.   The two which were lost were worth $14, less the freight.   Plaintiff paid for the finding and collecting and return to Wilton of those which were recovered $230.

Goolsby testified that the pens of the railroad at Wilton were "ordinary pens for penning and loading cattle into railroad cars;" that the plaintiff agreed to pay "$2 a head for getting up the cattle;" that they were worth $1.50 or $1.75 less per head on the 14th of April, 1898, than they were on the 29th of March preceding.

S. T. Gordon testified: "The cattle pens of the railroad at Wilton were in bad condition on the 29th of March, 1898. · The main posts were rotten, and the planks were nailed on from the outside."

Gardner testified: "We gathered ninety-nine head, including the twelve that remained on the cars. I cannot tell how many cattle we found on each day. We kept the cattle three or four days before we delivered them on the cars."

Goldsmith testified: "We fed the cattle nine or ten days." "On the fifth day after these cattle got out, we had up over two-thirds of them."

Harry Dunkerton testified: There was no contract made between him, as agent of the Kansas City, Pittsburg & Gulf Railroad Company, and the plaintiff. He wanted two cars. Witness had them placed convenient for him to load with cattle. He said he wanted to ship his cattle somewhere in Texas. Plaintiff was to load the cars. The defendant refused to execute a bill of lading for the cattle before they were put on the cars, and to receive them in the pens.

Upon this testimony, at the request of the plaintiff, over the objection of the defendant, the court instructed the jury as follows:

1. "The court instructs the jury that if they believe from the evidence in this case that the defendant, Kansas City, Pittsburg & Gulf Railroad Company, is a railroad corporation and a common carrier for hire, and that said defendant received into its

stock pen at Wilton the cattle mentioned in plaintiff's complaint, of the plaintiff, for the purpose of shipping the same over its line of road to Texarkana or to any other point, the liability of the defendant for the safe keeping of and damages to said cattle began when said cattle were put into its said stock pen at Wilton for shipment, and received by the defendant, provided the defendant or its agent knew that said cattle were put therein for the purpose of shipping same over its line of railroad, and to render defendant liable it is not necessary that a bill of lading for said cattle should have been signed by defendant.

2. "The jury are instructed that where cattle have been delivered to a common carrier for transportation, and they are not delivered to their destination within a reasonable time, the damages recoverable on account of the delay, if the cattle of the particular kind shipped have fallen in market value during the delay, is the difference between the value of the cattle at the time and place they should have been delivered and their value when they were in fact delivered, with six per cent. interest, after deducting the cost of transportation; the value at the time when they were in fact delivered being computed at the place of destination. So, in this case, if you find from the preponderance of evidence that plaintiff delivered to defendant the cattle named in the complaint, to be by defendant transported from Wilton to Bonham, Texas, and that said cattle were not delivered at their destination in a reasonable time after such delivery, and that cattle of the particular kind shipped had fallen in market value during the delay, and your verdict is for plaintiff, the measure of damages on account of such delay is the difference between the market value of the cattle so delivered to defendant at Bonham, Texas, at the time they should have been delivered and their value at Bonham, Texas, when they were in fact delivered, with interest from date of the delivery at the rate of six per cent. per annum.

3. "If you find for the plaintiff, in estimating his damages you may include in your verdict the necessary expense incurred by the plaintiff, if any be proved, in gathering said stock and in holding them preparatory to reshipment, including a reasonable compensation to plaintiff for time lost and money expended by him, if any be proved, in and about the collection and shipment of said cattle, which was necessary."

Are these instructions correct? In the absence of a contract limiting the liability of a common carrier, he is liable for all losses

except those caused by the act of God, by the public enemy, by the inherent defect, quality or vice of the thing carried, by the seizure of goods or chattels in his hands under legal process, or by some act or omission of the owner of the goods. When he undertakes to carry live stock, he is liable as an insurer to the same extent as when engaged in the transportation of general merchandise, except as to injuries caused by the animals themselves, and to each other—losses that are caused by their inherent vices and propensities. He cannot, however, be considered as having assumed this liability until the goods or live stock have been delivered to and accepted by him for immediate transportation in the usual course of business. *Little Rock & Fort Smith Railway Company* v. *Hunter*, 42 Ark. 203.

In *Railway Company* v. *Murphy*, 60 Ark. 338, it is said: "When the shipper surrenders the entire custody of his goods to the carrier for immediate transportation, and the carrier so accepts them, *eo instanti* the liability of the common carrier commences. When this occurs, the delivery is complete, and it matters not how long, or for what cause, the carrier may delay putting the goods *in transitu*; if a loss is sustained, not occasioned by the act of God or the public enemy, the carrier is responsible. But, on the contrary, as there is no divided duty of safe keeping, and no apportionment, in the event of loss, between the owner and the carrier, the surrender of control over the goods by the shipper must be such as to give the carrier the unqualified right to put at once *in itinere,* and the carrier must have received them for that purpose. So that, when goods are delivered to the carrier that are not yet ready for shipment, awaiting further orders from the owner, or the happening of some contingency or compliance with some condition before they are ready to be moved, the liability of the carrier in the meanwhile can be no greater than that of an ordinary depositary or bailee."

In the first instruction given by the court at the instance of the plaintiff the court ignored the question of fact presented by the evidence. One witness testified that the cattle were not delivered to or received by the defendant for immediate transportation; that the plaintiff was to load the cars with the cattle; and that the defendant refused to receive the cattle for shipment until they were on the cars. The court, nevertheless, told the jury, "the liability of the defendant for the safe keeping of and damages to said cattle began when said cattle were put into its said stock

pen at Wilton for shipment, and received by the defendant, provided the defendant, or its agent, knew that said cattle were put therein for the purpose of shipping same over its line of railroad." In instructing as to the tests of the liability of the defendant as a common carrier, and what would be sufficient to render it liable as such, it withheld from the consideration of the jury the evidence to the effect that, although the cattle were received in the pens for the purpose of shipment, the plaintiff was to put them on the cars, and that until that was done the defendant refused to undertake to ship them.   The instruction was calculated to convey the idea, and may have done so, that the defendant became liable to the plaintiff as a common carrier when it ascertained that the cattle were put in the pens for the purpose of shipment, regardless of the evidence that it refused to accept the cattle for shipment until the plaintiff loaded the cars with them according to agreement.   The instruction is clearly erroneous, and should not have been given.

The second instruction given to the jury at the instance of the plaintiff is based upon the first, and to be understood must be read and construed in connection with it.   After telling the jury when the liability of the defendant as a common carrier for the safe keeping of, and damages to, the cattle began, it told them that if they found from the preponderance of the evidence that plaintiff delivered to defendant the cattle named in the complaint, to be by defendant transported from Wilton to Bonham, Texas, and that said cattle were not delivered at their destination in a reasonable time after such delivery, and that cattle of the particular kind shipped had fallen in market value during the delay, and your verdict is for plaintiff, the measure of damages on account of such delay is the difference between the market value of the cattle so delivered to defendant at Bonham, Texas, at the time they should have been delivered, and their value at Bonham, Texas, when they were in fact delivered, with interest from date of the delivery at the rate of six per cent. per annum.   This reasonably meant that, if the cattle were delivered and received in a way to render the defendant liable according to the first instruction, the defendant was liable for their depreciation in value if they were not delivered in a reasonable time after such delivery.   Under the first instruction the jury might have found, and probably did, that the duty to ship arose on the 29th of March, 1898, when the cattle were first placed in the pens; and under the second in-

struction were authorized to find that the defendant was liable for the depreciation in value because the cattle were not delivered at their destination within a reasonable time after that date, when, under a correct instruction, they could and might have found, under the evidence, that the cattle were not delivered and received for transportation until the 14th of April, 1898, and were delivered at their place of destination within a reasonable time thereafter. The second instruction was affected with the vice of the first, and in that connection should not have been given.

The third instruction given at the instance of the plaintiff is likewise erroneous. He was not entitled to recover anything on account of expenses incurred in going from Wilton to Texarkana and returning, and for time spent in negotiating with Mr. Snooks, or for expenses in holding the cattle longer than was reasonably necessary, after their recovery, preparatory to shipment. Under the third instruction the jury may have included such expenses in the amount of the damages for which they returned a verdict. It should not have been given.

In confining what we have said to the liability of the defendant as a common carrier, we do not mean to make the impression that it was not liable in any other way.

Reversed and remanded for a new trial.

WOOD, J., did not participate.