CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY V. THOMAS POWERS.

FILED MAY 17, 1905. No. 13,812.

1. **Carriers: LIABILITY.** When a shipper surrenders the entire custody of his goods to a common carrier for immediate transportation, and the carrier so accepts them, the liability of the carrier at once attaches.

2. **Delivery of Freight.** Such liability does not attach until the goods are unconditionally delivered by the shipper and accepted by the carrier.

3. ———. A railroad company which constructs yards by the side

of its track to facilitate the loading and unloading• of stock is not responsible as a common carrier for stock placed in such yards for subsequent shipment, but subject to the right of the shipper to remove the stock from the pens for feed and water, before the shipment is actually made.

4. ———: LIABILITY. In such a case the liability of the company is no greater than that of an ordinary depositary, or bailee.

ERROR to the district court for Butler county: BEN-JAMIN F. GOOD, JUDGE.   *Reversed.*

*J. W. Deweese* and *Frank E. Bishop,* for plaintiff in error.

*Matt Miller, contra.*

OLDHAM, C.

This was an action for damages originally instituted in the county court of Butler county.   The petition alleged, in substance, that on the 11th day of October, 1898, the plaintiff purchased from one George Higgins and others 294 head of cattle which were, at the time of purchase, in the cattle pens of the defendant in the town of Thedford, Nebraska, awaiting shipment to South Omaha; that the pens were composed of rotten posts and decayed lumber, and were unfit for the purpose of keeping and maintaining cattle during the time that they were held in such yards awaiting shipment; and that on the night of the 11th day of October, 1898, the cattle broke out of said yards between the hour of midnight and four o'clock next morning.   The petition then alleges that the plaintiff was put to great annoyance and trouble in pursuing the cattle, and was forced to expend considerable money in employing herders to search for and drive back the said cattle; and that he was delayed from Wednesday until Saturday in procuring the shipment of the cattle to South Omaha.   He prayed for judgment for $1,000.   Defendant answered, specifically denying that the cattle had ever been delivered to and accepted by it for purposes of shipment.   On issues thus

55

joined there was a trial to a jury, a verdict for plaintiff for $250 and judgment on the verdict. To reverse this judgment defendant brings error to this court.

The only allegation in the petition in error necessary to be examined is that the evidence is not sufficient to sustain the judgment. The facts underlying the controversy are that on the 11th day of October, 1898, plaintiff Powers came to the village of Thedford for the purpose of going to a ranch on which part of the cattle in controversy were kept to see if he could purchase them. He inquired of the station agent of the defendant railroad company if he could get a stage out to the ranch. The agent told him that the stage had gone, but that the owners of the cattle were driving them to town that day, and that they would be in Thedford in the evening for shipment the next day to South Omaha. Powers got a conveyance, and went to meet the owners of the cattle. He began negotiating for the purchase of the herd, which was owned by three different men of the names of Higgins, Edinger and Spencer. He had not succeeded in effecting the purchase when the cattle arrived at Thedford, and the owners had put them in the stock pens of the defendant, near its railroad tracks. After the cattle were yarded, Powers consummated a purchase of the entire herd from the different owners, and notified the station agent of the defendant that he would ship the cattle the next day, as the others had intended to do. Plaintiff seems to have looked after his stock from time to time until about 12 o'clock at night. At about sunrise in the morning Higgins, one of the former owners of the cattle, went down to the pens, as he says, to let the cattle out, and feed, water and range them. He discovered that the side of the pens furthest from the track had been broken through, and the herd all gone and scattered over the range. In the panel of the fence that was broken, Higgins and plaintiff each testify that they found three posts that were rotted below and up to the surface of the ground. They made no claim of any rotten or decayed boards on the sides of the pen, but concluded from

the fact of three posts being rotted that the fence was insecure and unfit to hold cattle yarded for shipment. Defendant, on the other hand, introduced evidence, which was undisputed, tending to show that the pens had been thoroughly repaired by the repair foreman of the company but 30 days before the escape of the cattle. New and strong posts had been firmly set in the ground between each of the posts which had rotted below the surface of the ground, and the boards, all of which were sound and sufficient, had been firmly nailed to these new posts. The evidence of the defendant further tended to show that the herd of cattle had been taken from the range, and had been stampeded by fright at a passing train, and had surged with such violence against the sides of the pen that they had broken new boards on the fence and pushed the new posts out of the ground.

Now, the question to determine is whether or not there is any competent evidence in the record to show that defendant company had received the cattle unconditionally for immediate shipment on the evening of the 11th day of October, 1898. That defendant's station agent permitted the owners of the cattle to yard them in the pens of the defendant company is beyond dispute. But, it is also beyond question that the owners knew, when they put the cattle in the pens, that there would be no engine to take the cars to South Omaha until about 11 o'clock next day. It is also clearly shown that the owners of the cattle intended to take the stock out of the pens in the morning, to feed, water and range them until about 10 o'clock. We think the rule well established that, when a shipper surrenders the entire custody of his goods to a common carrier for immediate transportation, and the carrier so accepts them, the liability of the carrier as a practical insurer of the safe delivery of the goods at once attaches. *Kansas City, P. & G. R. Co. v. Barnett,* 69 Ark. 150, 61 S. W. 919. But, we think it equally well settled that such liability does not attach until the goods are unconditionally surrendered by the shipper and accepted by the

carrier. And, where a railroad company constructs yards by the side of its tracks to facilitate the loading and unloading of stock, it is not responsible as a common carrier for stock placed in such yards for the convenience of the owner, who intends to ship on a subsequent day, and reserves the privilege of taking the stock from the pens for the purpose of feeding and caring for them before the shipment is made. In such a case the liability of the company is no greater than that of an ordinary depositary or bailee. *St. Louis, I. M. & S. R. Co. v. Murphy,* 60 Ark. 333, 30 S. W. 419; *Missouri, K. & T. R. Co. v. Byrne,* 100 Fed. 359.

We are therefore of opinion that the evidence is insufficient to sustain the judgment, and we recommend that the judgment of the district court be reversed and the cause remanded for further proceedings.

AMES and LETTON, CC., concur.

By the Court: For the reasons given in the above opinion, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.