OMAHA ELEVATOR COMPANY, APPELLEE, v. CHICAGO, BUR-
LINGTON & QUINCY RAILROAD COMPANY, APPELLANT:
UPDIKE COMMISSION COMPANY ET AL., APPELLEES.

FILED MAY 15, 1920. No. 20832.

1. Carriers: BILL OF LADING. A bill of lading is a carrier's receipt for property and a contract to carry and deliver it.

2. ———: ———. A bill of lading is evidence of ownership in the hands of the holder; but it is not a negotiable instrument, and does not preclude inquiry into the circumstances under which it is transferred or surrendered.

3. ———: ———. Without the receipt or possession of property to transport, or to divert beyond the original destination, there can be no valid bill of lading.

4. ———: ———: DIVERSION OF CONSIGNMENT. After a carrier has transported property and permanently lost possession and control of it by delivery under the original bill of lading, a subsequent bill of lading issued by the same carrier for the purpose of diverting the original consignment to a different destination is void.

5. ———: ———: ———: INTERSTATE BUSINESS. After a carrier has received, transported and delivered an intrastate shipment under the original bill of lading, and has thus permanently lost possession and control of the property, the same carrier, by subsequently issuing a void bill of lading for the purpose of diverting the identical shipment to a station outside of the state, cannot make its services interstate business.

6. Sales: CONDITIONAL SALES. A contract of conditional sale of personal property may be valid between the parties, though unrecorded, where rights of innocent purchasers or creditors have not intervened.

7. Estoppel: EQUITY. Where one of two parties to transactions must suffer a loss through the misconduct or the wrongs of a third person, the superior equities will be determined from all of the material circumstances, and the burden will be allowed to fall where equity and justice place it.

8. ———: DISCLAIMER. Plaintiff's claim to specific property held not defeated by a disclaimer or by a judgment in a former action.

9. Warehousemen: LIABILITY. A promise by an elevator company to protect a carrier in the delivery of a car of corn, held not to go

beyond the obligation to retain the corn for the benefit of the owner.

10. Principal and Surety: INDEMNITY BOND. An indemnity bond executed by an elevator company to protect a carrier from losses occasioned by the delivery of grain before the surrender of the bills of lading is not breached by a proper delivery of a consignment, nor does such a bond protect the carrier from a loss resulting from its own negligence or from its own mistake.

APPEAL from the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. *Affirmed.*

*Byron Clark, Jesse L. Root* and *J. W. Weingarten,* for appellant.

*Smith, Schall & Howell, Brogan, Ellick & Raymond, W. H. Howard* and *J. C. Kinsler,* contra.

ROSE, J.

This is a suit in the nature of a bill of interpleader. The subject of litigation is a fund of $2,582.95, the proceeds of a car of corn loaded at La Platte, Nebraska, received there by the Chicago, Burlington & Quincy Railroad Company, carrier, from H. Rohn, consignor, consigned to the Dawson Grain Company, Omaha, Nebraska, transported to Omaha by the carrier, and unloaded by the Omaha Elevator Company, plaintiff, at its elevator in Council Bluffs. Plaintiff claims no interest in the consignment beyond the right to retain the customary charges for elevator services. After the corn became the subject of controversy, plaintiff brought into court in this action as defendants the rival claimants and other parties, pleading a willingness, upon an adjudication of their rights, to turn over to the owner the fund derived from an authorized sale; the proceeds, by agreement of all concerned, being held by plaintiff in lieu of the corn. The claimants are the Dawson Grain Company, consignee, and the Chicago, Burlington & Quincy Railroad Company, carrier. The controversy between them grew out of conflicting orders relating to the carrier's disposition or delivery of the car at Omaha.

The transactions through which the consignee traces the title to the corn and to the proceeds in the hands of plaintiff may be summarized as follows: Walter F. Dawson, a dealer in grain in the name of the Dawson Grain Company, consignee, was a member of the Omaha Grain Exchange. On the trading floor thereof, before procuring the bill of lading, Dawson conditionally sold the car of corn to William R. Richter, also a member of the Omaha Grain Exchange, doing business as the United States Commission Company. Under the rules of the Omaha Grain Exchange, Richter gave Dawson a receipt containing an agreement that the title to the bill of lading and to the contents of the car should pass to Richter only upon a surrender of the receipt and full payment of the purchase price, though the terms of the sale were not publicly recorded. Following the sale the carrier was directed in writing by Dawson to switch the car to the order of Richter, "bill of lading to follow." Richter authorized the Albers Commission Company to resell the corn, and to that end, under authority from the latter, the carrier was directed by plaintiff to deliver the car to it. In compliance with this direction, the carrier, without the surrender of the bill of lading, switched the car to a transfer track in Omaha, whence it was taken by the Union Pacific Railroad Company to plaintiff's elevator at Council Bluffs and there unloaded. Dawson insists that he procured the corn from Rohn by purchase, did not receive the purchase price after he sold it to Richter or part with his title, never lost his right to assert his ownership, and is entitled to the proceeds.

The other claimant, the carrier, contends that it is not bound by any rule of the Omaha Grain Exchange, or by any undisclosed condition of the sale by Dawson to Richter. The carrier relies in part on orders, transactions and facts which, for the purposes of one phase of the case, may be summarized as follows: Richter purchased the car of corn from Dawson, procured the bill

of lading, directed the carrier in writing to divert the consignment to Chicago, "notify the Updike Commission Company," and demanded what is termed an "order bill of lading," which the carrier issued in exchange for the surrendered original bill of lading, and delivered the order bill of lading to Richter, who indorsed it, at-tached it to a draft for $2,800, which was mailed to Chi-cago for collection and there paid by the Updike Com-mission Company. The car of corn was never diverted or shipped to Chicago. The Updike Commission Com-pany sued the carrier for the loss, and recovered a judg-ment, which the carrier paid in full. The carrier con-tends that the title to the corn passed to the Updike Commission Company in the manner described, that the latter is entitled to the protection of a *bona fide* pur-chaser, and that the carrier is subrogated to the rights of the Updike Commission Company.

The facts on which the rival claimants base their claims are alleged in detail and traversed by formal pleas. The carrier also pleads other facts to show that its loss is recoverable from plaintiff, if it is not pro-tected by the fund in controversy; but these pleas will be omitted here and considered later in proper order to prevent the confusion of complicated issues. The evi-dence in material respects is practically without con-flict. The trial court found all of the issues in favor of plaintiff and of defendant Dawson. The carrier has appealed.

Who has the better claim? Who shall suffer the loss occasioned by Richter's double-dealing which result-ed in the unloading of the car at plaintiff's elevator and in the issuing of an order bill of lading for the purpose of diverting the original consignment from Omaha to Chicago? Who first learned of the dual orders? Who trusted the perpetrator of the fraud? Who could have prevented the loss?

By means of the receipt, Dawson retained in himself the title to the original bill of lading and to the contents

of the car, when he sold his corn to Richter. Under the terms of the sale, title could pass only upon payment of the purchase price in full. These terms of the sale complied with the rules of the Omaha Grain Exchange and bound both parties, who were members thereof. The purchase price was never paid to Dawson, nor to any one for him. As between him and Richter the title remained in the former. Is either the Updike Commission Company or the carrier entitled to the protection of an innocent purchaser? The original bill of lading, when surrendered by Richter to the carrier under the circumstances, the order by him to divert the original consignment to Chicago, the issuance of the order bill of lading, and the making and the paying of the draft, did not necessarily destroy Dawson's title to the corn, nor make the Updike Commission Company or the carrier an innocent purchaser. A bill of lading is a carrier's receipt for property and a contract to carry and deliver it. It is not the consigned property, nor the title thereto, nor a negotiable instrument. It is evidence of ownership in the hands of the holder, but does not preclude inquiry into the circumstances under which it is transferred or surrendered. Without the receipt or possession of property to transport, or to divert beyond the original destination, there can be no valid bill of lading. The liability of a carrier for the transportation and delivery of property does not attach until it receives the property. *Chicago, B. & Q. R. Co. v. Powers,* 73 Neb. 816; *Burrowes v. Chicago, B. & Q. R. Co.,* 85 Neb. 497. It follows that, after a carrier has transported property and permanently lost possession and control of it by delivery under the original bill of lading, a subsequent bill of lading issued by the same carrier for the purpose of diverting the original consignment to a different destination is void. "The receipt of the goods," said the supreme court of the United States, "lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to carry

or to deliver.'' *Pollard v. Vinton,* 105 U. S. 7; *St. Louis I. M. & S. R. Co. v. Knight,* 122 U. S. 79; *Crenshawe v. Pearce,* 37 Fed. 432; *Missouri P. R. Co. v. McFadden,* 154 U. S. 155; *Friedlander v. Texas & P. R. Co.,* 130 U. S. 416. As required by the original bill of lading, the carrier transported the consignment from La Platte to Omaha. Pursuant to the first order of Richter, the car was switched by the carrier to a transfer track in Omaha for plaintiff's elevator. There the carrier thus permanently lost possession and control of the shipment. On these facts the carrier never had the car of corn as an interstate shipment, or authority to divert it into one. In this case, therefore, federal law is not involved. When Richter surrendered the original bill of lading to the carrier and directed the diversion of the consignment to Chicago, he did not own the car of corn, or have it to sell, or to divert, or to ship, and the carrier did not then or thereafter have it for transportation. The order bill of lading, therefore, did not represent anything. It was void, and did not protect the Updike Commission Company or the carrier. The Updike Commission Company had no interest in the corn to which the carrier could be subrogated. The carrier, without authority, issued and gave currency to the void order bill of lading, resulting in the loss to the Updike Commission Company. Furthermore, a few minutes after Richter procured the order bill of lading for the purpose of diverting the original consignment to Chicago, the carrier learned that the car had already been switched by his previous order to the transfer track for plaintiff's elevator. The carrier also knew that Richter was not the only claimant. With knowledge of these facts, the carrier requested Richter to return the order bill of lading before it had passed beyond his control, and trusted him to do so. After he failed to comply with the request, there was ample time for the carrier to notify the Updike Commission Company at Chicago that the outstanding order bill of lading issued to Richter did not represent any shipment.

This warning was demanded by ordinary business judgment and would have prevented the loss resulting from the payment of the draft, but was not given. In addition, the carrier was the first to discover the dual orders of Richter, and thereafter trusted him to return the void order bill of lading. With knowledge of the facts, the carrier did not avail itself of the means at hand to prevent the loss resulting in this controversy.

It is nevertheless argued by the carrier that Dawson should bear the burden, since he sold the corn to Richter, failed to publicly record the terms of his sale, put in the hands of his purchaser the evidence of ownership, and neglected to comply with a rule of the Omaha Grain Exchange, by omitting to stamp on the face of the original bill of lading before parting with it the following notice: "Receipt issued for this bill of lading under the rules of the Omaha Grain Exchange." It is insisted that Dawson, by his course of dealings, not only parted with his title, but thus lost his right to claim ownership, and that the carrier, in issuing the order bill of lading for the purpose of diverting the original consignment to Chicago, acted on proper evidence of Richter's purchase and of the subsequent sale to the Updike Commission Company. For reasons already stated, these considerations, on the undisputed facts, do not control the issue. Before the dealings or conduct of any party to the controversy had culminated in damages or had made a loss unavoidable, the carrier delivered the car of corn, under directions traceable to Richter, on a switch-track, where Dawson's ownership could be asserted and protected. This delivery would have also protected the carrier, notwithstanding Richter's subsequent misuse of the original bill of lading. At a time when the carrier had both knowledge and means sufficient for the protection of itself, Dawson, and the Updike Commission Company, it issued and delivered the void order bill of lading and permitted it to be used to the injury of the Updike Commission Company. On the facts outlined, the

superior equities are on the side of Dawson. Of the rival claimants to the proceeds of the corn, he was less at fault than the carrier. Under familiar rules of equity, Dawson has the better claim, and the loss must be borne by his rival.

The pleadings raise also the issue that in the former suit, brought by the Updike Commission Company a- gainst the carrier, the claim of Dawson is defeated by a disclaimer on his part and by a judgment in favor of the carrier. This point is ably and confidently argued, but a different view of the pleadings and judgment seems to be more logical and just. While Dawson dis- claimed any interest in the controversy between the Up- dike Commission Company and the carrier, his dis- claimer should not be construed as a renouncement of his title to the identical corn in the hands of plaintiff; nor should the judgment pleaded as a bar be regarded as an adjudication that he did not own such corn, or as an estoppel preventing him from claiming it.

There is another aspect of the case in which there is an issue of plaintiff's liability to the carrier for the value of the corn, if the latter's claim to the proceeds is disallowed. One ground on which this alleged liability is based is the promise of plaintiff to protect the carrier. The promise was made by telephone. The conversation does not disclose the nature of the protection promised, nor the manner of performing the obligation. The effect of the promise, therefore, must be determined by the circumstances. Plaintiff handled the corn for the ele- vator charges, and had no other interest in it except to deliver it to the owner. For that purpose the corn or the proceeds have been at all times available. Had the carrier relied on its delivery of the car to plaintiff, in- stead of issuing an order bill of lading after delivery of the original consignment, there would have been no loss to any one. Under the circumstances, therefore, the promise of protection does not go beyond plaintiff's ob-

ligation to retain the corn or the proceeds for the benefit of the owner—a promise which has been kept.

The pleadings raise the additional issue that plaintiff, if the carrier is defeated on other grounds, is liable on a bond to indemnify it against losses resulting from the delivery of consignments of freight before the bills of lading have been surrendered. A breach of the bond has not been established. The carrier, in delivering the corn to plaintiff, did not incur any loss. The damages suffered by the Updike Commission Company and the carrier were caused by the issuance of the void order bill of lading. The bond does not protect the carrier against loss resulting from its own negligence or its own mistake.

No error has been found in the record, and the judgment is

AFFIRMED.

LETTON, DAY and FLANSBURG, JJ., not sitting.