JOE A. LAW AND YALE HALPERIN, COPARTNERS DOING BUSINESS AS WHITE LINE TRANSFER COMPANY, APPELLEES, V. EMPLOYERS MUTUAL CASUALTY COMPANY, A CORPORATION, APPELLANT, IMPLEADED WITH SAM FRIEDMAN, APPELLEE.

43 N. W. 2d 188

Filed June 23, 1950.    No. 32775.

*Joseph H. McGroarty,* for appellant.

*Ephraim L. Marks,* and *Shrout, Brown & Thurmond,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

YEAGER, J.

This is an action which, as originally instituted, was by the plaintiffs Joe A. Law and Yale Halperin, copartners doing business as White Line Transfer Company, against Employers Mutual Casualty Company, a corporation, and Sam Friedman, defendants, to have declared, under the Declaratory Judgments Act, the liability, if any, of the defendant Employers Mutual Casualty Company on a policy of insurance issued to the plaintiffs for the loss of 93 kegs of nails belonging to the defendant Sam Friedman which were stolen from the dock of the plaintiffs and for an appropriate judgment for the value of the nails in case of a finding of liability.

The policy of insurance in question protected the plaintiffs against loss by theft of merchandise such as is

involved here while in the hands of the plaintiffs as a common carrier. The policy insured against theft from cargo or storage on docks or in warehouses for not more than 24 hours provided the merchandise was in actual transit or in other words in the hands of plaintiffs as a common carrier. Insofar as the matters herein involved are concerned there was no liability under the policy unless at the time the nails were stolen they were in the status of merchandise in the hands of plaintiffs as a common carrier. This the defendant Employers Mutual Casualty Company contends, and the plaintiffs and the defendant Sam Friedman concede the contention in their brief filed herein as follows:

"The issue on this appeal therefore narrows down to the question:

"Was the merchandise in the custody and control of the White Line Transfer Company, at the time of theft, as a common carrier, while temporarily on docks or in warehouse for a period of not exceeding 24 hours, and while in actual transit, so as to come within the specific coverage of the Marine and Cargo Theft Endorsement?"

There is no contention that there is any liability under the policy of insurance to the defendant Friedman. Apparently he was made a party on the theory that a recovery by the plaintiffs would redound to his benefit and that to join him as a party and set up his rights against the plaintiffs would have the effect of avoiding unnecessary litigation.

In any event the litigation was so conducted apparently without objection. A trial was had and the court determined that the Employers Mutual Casualty Company was liable under the policy of insurance for the loss, and judgment was rendered in favor of the defendant Sam Friedman for the value of the merchandise stolen. From the judgment the defendant Employers Mutual Casualty Company has appealed.

There are four assignments of error but their substance is found in one which the parties agree, as has already

been pointed out, contains the only question to be considered in this case. It is as follows: "The Court erred in holding that at the time and place of the theft the plaintiff was holding the cargo as a common carrier."

There is no question but that it is the rule that merchandise in order to be regarded as merchandise in the hands of a common carrier must be received for immediate shipment and unconditionally accepted with nothing remaining to be done by the shipper to complete the shipment. If goods are delivered to a carrier and held at the request of or subject to the control or direction of the shipper their status is not that of goods in the hands of a common carrier. Chicago, B. & Q. R. R. Co. v. Powers, 73 Neb. 816, 103 N. W. 678; Burrowes v. Chicago, B. & Q. Ry. Co., 85 Neb. 497, 123 N. W. 1028, 34 L. R. A. N. S. 220; Barron v. Eldredge, 100 Mass. 455, 1 Am. R. 126; Watts v. Boston & Lowell R. R. Corporation, 106 Mass. 466; St. Louis, A. & T. H. R. R. Co. v. Montgomery, 39 Ill. 335; Schmidt v. Chicago & N. W. Ry. Co., 90 Wis. 504, 63 N. W. 1057; Adair v. Yazoo M. V. R. R. Co., 142 Miss. 345, 107 So. 371; 9 Am. Jur., Carriers, § 674, p. 828; 13 C. J. S., Carriers, § 150, p. 297; Annotation, 22 A. L. R. 970; Annotation, 113 A. L. R. 1459; 1 Michie on Carriers, § 1090, pp. 882 to 884; Van Zile, Law of Bailments and Carriers, § 186, p. 158.

It follows therefore that the status of these nails at the time they were stolen must be ascertained by reference to the facts as disclosed by the record. The facts are not in dispute. The only evidence adduced was on behalf of the plaintiffs and defendant Sam Friedman. Their interests insofar as the questions involved in the litigation are concerned were in nowise adverse. Their interests were concurrently adverse to those of the defendant Employers Mutual Casualty Company.

By evidence of these parties it was made to appear that on December 23, 1948, a truck belonging to plaintiffs picked up at the direction of and for Sam Friedman 124 kegs of nails. These were to be a part of a carload

shipment which was to be made to California on the following day. Friedman directed that the load be taken to the place of business of plaintiffs where it was to remain overnight when it was to be taken to the team track of the Union Pacific Railroad Company where it was to be loaded on a car with other nails for shipment. No car had been ordered or was ever ordered for the shipment. On account of the condition of the weather and the lack of space to hold the trailer on which the nails were loaded the nails were by direction of one of the plaintiffs unloaded on an inside dock. During the night the place was forcibly entered and 93 of the kegs of nails were stolen.

On the question of control over this lot of 124 kegs of nails after they had been picked up on December 23, 1948, Friedman testified: "Q- * * * Now, what did you do with that one hundred and twenty-four kegs of nails? A- They went back to the White Line Transfer. Q- Do you remember about what time of the day? A- Yes, I remember exactly what happened. It was getting late in the afternoon after my last stop was made at the Sutherland Lumber Company, and it was beginning to drizzle a little bit, and as I recall it turned into snow later and the driver said, 'Do you want these put in the car tonight?' and I said, 'No it is too late and Joe and Yale don't like to pay overtime, and it is getting late so you run them into the White Line and leave them on the truck and I will move it to the dock the next morning.'" "Q- Did you talk to anybody when you got to the White Line? A- I talked to Mr. Law. Q- Tell us the substance of your conversation? * * * A- I said, 'Joe, I want you to take these nails that are on the truck, and leave it on the dock and I will call you in the morning and we will run them down to the team track, and I will call you and give you the number.'" "Q- So when the nails were returned to the White Line Transfer Company you say you had a talk with Joe Law? A- Yes. Q- And you told Joe that you intended to ship the nails out in the morn-

ing? A- That is right? Q- At that time, of course, you, I presume, told him you would call him in the morning? 'A- I told him to leave them on the dock if he would come and we would run them out to the team track in the morning, and he said that it could be arranged and he would do it. Q- And you told him you would give him the instructions as to your car number in the morning? A- I gave him those instructions that night. Q- But you did not have any car on the team track? A- No."

In addition to this evidence which has been in part summarized and in part quoted, there is evidence indicating a possibility of inability to procure a car at the Union Pacific team track in which event if it occurred he had made available to him a car at Council Bluffs, Iowa, in which he would make the shipment which of course would involve from him direction for transfer of the nails to that location.

In the light of this evidence it becomes clear that every move and handling made or contemplated of these nails except one was under the direct supervision and control of Sam Friedman. The single exception was the unloading from the trailer to the dock at the location to which he had directed them to be taken on December 23, 1948, and where by his direction they were to remain until the following day.

Within the clear meaning of the decisions of this court and the courts of other jurisdictions and the texts hereinbefore cited, quotations from which would needlessly encumber this opinion, it cannot well be said that the nails for which recovery is sought in this action were at the time they were stolen in transit or held by the plaintiffs as property in the hands of a common carrier so as to attach to their loss the liability of a common carrier.

The judgment of the district court is reversed and the action dismissed.

REVERSED AND DISMISSED.